# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SPRINT COMMUNICATIONS COMPANY LP., <br> *Plaintiff*, <br> v. <br> CHARTER COMMUNICATIONS, INC., *et al.*, <br> *Defendants*. | C.A. No. 17-1734-RGA <br><br> **PUBLIC VERSION** |
| SPRINT COMMUNICATIONS COMPANY LP., <br> *Plaintiff*, <br> v. <br> MEDIACOM COMMUNICATIONS CORP., <br> *Defendants*. | C.A. No. 17-1736-RGA <br><br> **PUBLIC VERSION** |
| SPRINT COMMUNICATIONS COMPANY LP., <br> *Plaintiff*, <br> v. <br> WIDEOPENWEST, INC. *et al.*, <br> *Defendants*. | C.A. No. 18-361-RGA <br><br> **PUBLIC VERSION** |
| SPRINT COMMUNICATIONS COMPANY LP., <br> *Plaintiff*, <br> v. <br> ATLANTIC BROADBAND FINANCE, LLC *et al.*, <br> *Defendants*. | C.A. No. 18-362-RGA <br><br> **PUBLIC VERSION** |
| SPRINT COMMUNICATIONS COMPANY LP., <br> *Plaintiff*, <br> v. <br> GRANDE COMMUNICATIONS NETWORKS, LLC *et al.*, <br> *Defendants*. | C.A. No. 18-363-RGA <br><br> **PUBLIC VERSION** |

**CHARTER'S AND DEFENDANTS' BRIEF IN SUPPORT OF THEIR OPPOSITIONS TO SPRINT'S MOTIONS FOR SUMMARY JUDGMENT AND MOTIONS TO EXCLUDE EXPERT TESTIMONY UNDER *DAUBERT***

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ iv

I.      INTRODUCTION ........................................................................................... 1

II.     SUMMARY JUDGMENT STANDARD ........................................................ 1

III.    CHARTER CANNOT BE ESTOPPED BASED ON AN ACTION AGAINST
OTHERS THAT NEVER DECIDED CHARTER'S CURRENT DEFENSES ................ 1

     A.    Statement Of Facts ................................................................................ 2

     B.    Legal Standard For Issue Preclusion .................................................... 3

     C.    The Charter Defendants, As Nonparties, Were Not "Fully Represented" In
The Kansas Action ................................................................................ 4

           1.    The "Substantive Legal Relationship" Exception Does Not Apply .......... 4

           2.    The "Represented By Someone With The Same Interests"
Exception Does Not Apply ...................................................... 5

           3.    The "Assumed Control" Exception Does Not Apply ................................ 7

     D.    No Determination In The Kansas Action Precludes The Charter
Defendants In The Present Case ........................................................... 8

           1.    TWC's Litigation Of Any Invalidity Issue In The Kansas Action
Does Not Preclude The Charter Defendants From Litigating A
Different Invalidity Issue Here ................................................. 9

           2.    There Is No Preclusion Because Charter Is Not Litigating The
Same Issues That Were Tried In The Kansas Action ............................. 11

                 a.    Charter Is Not Litigating The Same Validity Issues Tried In
The Kansas Action, Therefore There Is No Preclusion Of
Invalidity ....................................................................... 11

           3.    Charter Is Not Litigating The Same Equivalence Issues That Were
Tried In The Kansas Action, Therefore There Is No Preclusion Of
Equivalence ...................................................................... 14

IV.    SPRINT'S MOTION FOR SUMMARY JUDGMENT OF NO INEQUITABLE
CONDUCT SHOULD BE DENIED .............................................................. 16

A.  Call Control Patents: Sprint's Knowing And Repeated Misrepresentations About The Existence Of The ATM Switch Were Material ................................. 16

    1.  The Call Control Specification and Claims .............................. 16

    2.  Sprint's Misrepresentations Were Material To The Patentability Of The Claims Of The Call Control Patents As Construed ........................... 18

B.  Broadband Patents: Sprint's Failure To Disclose Its Inability To Make The Disclosed Embodiment Was Material ................................. 19

C.  Sprint's Motion For Summary Judgement Of No Specific Intent Must Be Denied ................................................................. 22

V.  SPRINT'S EQUITABLE DEFENSES MOTION SHOULD BE DENIED .................... 24

A.  Factual Background ................................................. 24

    1.  Sprint Delayed In Filing Suit Against Charter/BHN Despite Knowing Of All Potentially Relevant Facts Of The Alleged Infringement ................................................. 24

    2.  Sprint Obtained The Asserted Patents Through Misrepresentations ........ 26

B.  Legal Standard ..................................................... 26

C.  Argument ........................................................... 27

    1.  There Is A Genuine Dispute As To Whether Sprint's Delay Constitutes Acquiescence Or Waiver ...................................... 27

    2.  There Is A Genuine Dispute As To Whether Sprint's Misrepresentations To The USPTO Constitute Unclean Hands .............. 29

VI.  *DAUBERT* STANDARD ................................................... 29

VII.  MS. MULHERN'S APPORTIONMENT ANALYSIS IS BASED ON SOUND METHODOLOGY AND TIED TO THE FACTS OF THIS CASE ............................... 30

A.  Factual Background ................................................. 30

    1.  Ms. Mulhern's Apportionment of Sprint's VoP Patent Portfolio Licenses ............................................... 31

    2.  Ms. Mulhern's Analysis Accounts for Other Contributions to VoIP ....... 34

B.  Argument ........................................................... 36

    1.  Ms. Mulhern's Apportionment Analysis Is Sound ................... 36

a.      The IP Share Approach is an Apportionment Analysis, Not
        a Top-Down Analysis ................................................................. 36

b.      The Numeric Proportionality Approach Is Tied to the Facts
        of this Case .................................................................................. 38

c.      The Skewed-Distribution Approach Is Tied This Case's
        Facts ............................................................................................. 39

d.      The CPC Analysis Is Reliable and Tied to the Facts of this
        Case .............................................................................................. 41

VIII.   DR. ALMEROTH'S SEPARATE PATENTABILITY OPINIONS ARE PROPER ....... 43

A.      Dr. Almeroth Demonstrated that the Accused Media Gateways Embody
        the Later-Issued Patents ......................................................................... 44

B.      USPTO Consideration Goes to Weight not Admissibility .................................. 45

# TABLE OF AUTHORITIES

## CASES

*Abbvie Deutschland GmbH & Co., KG v. Janssen Biotech, Inc.*
   759 F.3d 1285 (Fed. Cir. 2014) ............................................... 19

*Allergan Sales, LLC v. Sandoz, Inc.*
   211 F. Supp. 3d 907 (E.D.. Tex.. 2016)...................................... 12

*Am. Tech. Ceramics Corp. v. Presidio Components, Inc.*
   No. 14-CV-6544(KAM)(GRB), 2018 WL 1525686 (E.D.N.Y. Mar. 27, 2018)...................... 27

*Anderson v. Liberty Lobby, Inc.*
   477 U.S. 242 (1986).......................................................... 1

*Arlaine & Gina Rockey, Inc. v. Cordis Corp.*
   No. 02-22555-CIV, 2004 WL 5504978 (S.D. Fla. Jan. 5, 2004)............................ 45

*Ashe v. Corley*
   992 F.2d 540 (5th Cir. 1993) ............................................... 29

*Astrazeneca UK Ltd. v. Watson Labs, Inc.*
   905 F. Supp. 2d 596 (D. Del. 2012)...................................... 8, 10

*Auto. Techs. Int'l, Inc. v. BMW of N. Am., Inc.*
   501 F.3d 1274 (Fed. Cir. 2007) ............................................. 19

*Blonder-Tongue Labs, Inc. v. Univ. of Illinois Found.*
   402 U.S. 313 (1971).......................................................... 9

*Bristol-Myers Squibb Co. v. Teva Pharm. USA, Inc.*
   No. 10-805-RGA, 2012 WL 2951965 (D. Del. July 19, 2012) ................................ 24

*Celotex Corp. v. Catrett*
   477 U.S. 317 (1986)......................................................... 29

*Cheng v. AIM Sports, Inc.*
   No. CV-10-3814-PSG (PLAx), 2012 WL 12953831 (C.D. Cal. May 14, 2012) .............. 27, 29

*Crossroads Sys. (Texas), Inc. v. Dot Hill Sys. Corp.*
   No. A-03-CA-754-SS, 2006 WL 1544621 (W.D. Tex. May 31, 2006) .................................... 5

*Dana v. E.S. Originals, Inc.*
   342 F.3d 1320 (Fed. Cir. 2003) ............................................. 9

*Daubert v. Merrell Dow Pharm., Inc.*
   509 U.S. 579 (1993)........................................................ 29

*Digital Control, Inc. v. Charles Mach. Works*
   437 F.3d 1309 (Fed. Cir. 2006) ........................................................................ 22

*Endo Pharms, Inc. v. Actavis Inc.*, No. 14-1381-RGA, 2017
   No. 14-1381-RGA, 2017 WL 3731001 (D. Del. Aug. 30, 2017) ..................................... 5, 7, 16

*Engineered Prods. Co. v. Donaldson Co.*
   313 F. Supp. 2d 951 (N.D. Iowa 2004) ................................................................ 45

*Ferguson Beauregard/Logic Controls, Div. of Dover Res., Inc. v. Mega Sys., LLC*
   350 F.3d 1327 (Fed. Cir. 2003) ........................................................................ 37

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co. Ltd.*
   493 F.3d 1368 (Fed. Cir. 2007) ........................................................................ 44

*Helios Software, LLC v. Awareness Techs., Inc.*
   No. 11-1259-LPS, 2015 WL 12806482 (D. Del. Apr. 13, 2015) ................................... 23

*Henglein v. Colt Indus. Operating Corp.*
   260 F.3d 201 (3d Cir. 2001) .............................................................................. 4

*Hochstein v. Microsoft Corp.*
   No. 04-73071, 2009 WL 2022815 (E.D. Mich. July 7, 2009) .................................... 45

*i4i Ltd. P'ship v. Microsoft Corp.*
   598 F.3d 831 (Fed. Cir. 2010),
   *aff'd*, 564 U.S. 91 (2011) ................................................................................ 40

*In re Innovatio IP Ventures, LLC Patent Litig.*
   No. 11 C 9038, 2013 WL 5593609 (N.D. Ill. Oct. 3, 2013) .................................... 39

*Int'l Nutrition Co. v. Horphag Research Ltd.*,
   220 F.3d 1325 (Fed. Cir. 2000) .......................................................................... 4

*Intel Corp. v. Future Link Sys., LLC*
   C.A. No. 14- 377-LPS, 2017 WL 2482881 (D. Del. June 1, 2017).......................... 40

*Intellectual Ventures I LLC v. Check Point Software Techs. Ltd.*
   215 F. Supp. 3d 314 (D. Del. 2014)................................................................... 30

*Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.*
   458 F.3d 244 (3d Cir. 2006) .............................................................................. 4

*JumpSport, Inc. v. Acad., Ltd.*
   No. 6:17-CV-414-RWS-JDL, 2018 WL 10124888 (E.D. Tex. Sept. 6, 2018) ............. 27

*Klassen v. Allegro Dev. Corp.*
   106 A.3d 1035 (Del. 2014) ............................................................................... 26

*Lear, Inc. v. Adkins*
  395 U.S. 653 (1969)..................................................................................... 10

*LG Display Co. v. AU Optronics Corp.*
  Case No. 1:06-cv-00726-LPS, D.I. 1601 (D. Del. Sept. 15, 2010) ........................................... 39

*LG Display Co. v. AU Optronics Corp.*
  722 F. Supp. 2d 466 (D. Del. 2010)............................................................ 39, 40

*LG Elecs. U.S.A., Inc. v. Whirlpool Corp*
  No. 10–311–GMS, 2011 WL 4543886 (D. Del. Sept. 29, 2011) ........................................... 12

*Lucent Techs., Inc. v. Gateway, Inc.*
  580 F.3d 1301 (Fed. Cir. 2009) .................................................................... 38

*Mars, Inc. v. TruRx LLC*
  No. 6:13-cv-526-RWS-KNM, 2016 WL 4055676 (E.D. Tex. Apr. 29, 2016)........................ 27

*Marshak  v. Treadwell*
  240 F.3d 184 (3d Cir. 2001) ......................................................................... 8

*Martin v. Wilks*,
  490 U.S. 755 (1989)..................................................................................... 5

*Mentor Graphics Corp. v. EVE-USA, Inc.*
  851 F.3d 1275 (Fed. Cir. 2017) .................................................................... 37

*Nasalok Coating Corp. v. Nylok Corp.*
  522 F.3d 1320 (Fed. Cir. 2008) .................................................................... 10

*Nat'l Presto Indus., Inc. v. W. Bend Co.*
  76 F.3d 1185 (Fed. Cir. 1996) ...................................................................... 43

*Odyssey Wireless, Inc. v. Apple Inc.*
  No. 15-cv-01735-H-RBB, 2016 WL 7644790 (S.D. Cal. Sept. 14, 2016) ............................. 39

*Ohio Willow Wood Co. v. Alps S., LLC*
  735 F.3d 1333 (Fed. Cir. 2013) .................................................................... 23

*Oil-Dri Corp. of Am. v. Nestle Purina Petcare Co.*
  No. 15-C-1067, 2019 WL 861394 (N.D. Ill. Feb. 22, 2019) ................................................... 28

*Orexo AB v. Actavis Elizabeth LLC*
  371 F.Supp.3d 175 (D. Del. 2019)...................................................... 4, 9, 10

*Pall Corp. v. Fisher Sci. Co.*,
  962 F. Supp. 210 (D. Mass 1997) .................................................................... 5

*Power Integrations, Inc. v. ON Semiconductor Corp.*
  396 F.Supp.3d 851 (N.D. Cal. 2019) ............................................................ 5, 16

*Qualcomm Inc. v. Broadcom Corp.*
  548 F.3d 1004 (Fed. Cir. 2008) ..................................................................... 26

*ResQNet.com, Inc. v. Lansa, Inc.*
  594 F.3d 860 (Fed. Cir. 2010) ....................................................................... 38

*SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC*
  137 S. Ct. 954 (2017)..................................................................................... 28

*Sea-Land Servs., Inc. v. Gaudet*
  414 U.S. 573 (1974)......................................................................................... 5

*Siemens Med. Sols. USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc.*
  No. 07-cv-190, 2008 WL 114361 (D. Del. Jan. 8, 2008) ............................. 45

*Sonos, Inc. v. D&M Holdings Inc.*
  C.A. No. 14-1330-RGA-MPT, 2016 WL 4249493 (D. Del. Aug. 10, 2016) .......................... 26

*Sprint Commc'ns Co., L.P. v. Time Warner Cable, Inc.*
  760 F. App'x 977 (Fed. Cir. 2019) ................................................................ 14

*St. Jude Med. Cardiology Div., Inc. v. Volcano Corp.*
  1-10-cv-00631, D.I. 395 (D. Del. Oct. 9, 2012) ..................................... 44, 45

*Summit 6, LLC v. Samsung Elecs. Co., Ltd.*
  802 F.3d 1283 (Fed. Cir. 2015) ..................................................................... 29

*Suppan v. Dadonna*
  203 F.3d 228 (3d Cir. 2000) .......................................................................... 10

*TASER Int'l, Inc. v. Karbon Arms, LLC*
  6 F. Supp. 3d 510 (D. Del. 2013).............................................................. 10, 12

*Taylor v. Sturgell*
  553 U.S. 880, 884, 898 (2008)............................................................. 4, 5, 7, 8

*TC Tech. LLC v. Sprint Corp.*
  No. 16-cv-153-RGA, 2019 WL 2515779 (D. Del. June 18, 2019) ............. 36, 37, 38

*Trell v. Marlee Elecs. Corp.*
  912 F.2d 1443 (Fed. Cir. 1990) ..................................................................... 37

*VirnetX Inc. v. Apple Inc.*
  792 F. App'x 796 (Fed. Cir. 2019) ................................................................ 11

*Voter Verified, Inc. v. Election Sys. & Software LLC*
   883 F.3d 1376 (Fed. Cir. 2012) ............................................................... 11

*W.L. Gore & Assocs., Inc. v. C.R. Bard, Inc.*
   No. 11-515-LPS-CJB, 2015 WL 12731924 (D. Del. Nov. 4, 2015) ......................................... 42

*WARF v. Apple, Inc.*
   14-cv-062-wmc, 2015 WL 13546429 (W.D. Wis. Oct. 4, 2015) ............................................ 45

*Watts v. XL Sys., L.P.*
   No. 1:06–CV–653–LY, 2008 WL 5731945 (W.D. Tex. July 2, 2008) ..................................... 7

**RULES**

Fed. R. Civ. P. 56(a) .................................................................................. 1

Fed. R. Evid. 703 ...................................................................................... 40

## I.      INTRODUCTION

Sprint's summary judgment motions misapply the law and ignores numerous factual issues that preclude summary judgment. Sprint's *Daubert* motions similarly ignore that Charter's experts properly apply sound economic and technical methodologies to the facts of this case. As Sprint's motions are contrary to the law and ignore the facts, Sprint's motions should be denied.

## II.     SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). At the summary judgment stage, that "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## III.    CHARTER CANNOT BE ESTOPPED BASED ON AN ACTION AGAINST OTHERS THAT NEVER DECIDED CHARTER'S CURRENT DEFENSES.

Invoking the doctrine of collateral estoppel, otherwise known as issue preclusion, Sprint argues that "Charter/TWC" should not be able to relitigate issues it previously litigated and lost in the Kansas Action. But the Charter Defendants were never a party to that case and did not have control over its conduct; nor were all the issues for which Sprint seeks preclusion ever litigated previously.[1] These straightforward facts doom Sprint's motion.

Charter, Bright House and the Defendants in the Kansas Action ("TWC") were all separate companies when Sprint sued TWC in 2011, and remained separate companies all throughout claim construction, fact discovery, and expert discovery. (Ex 1, Abramov Decl. ¶ 6.)[2] Although Charter

---

[1] Charter uses the same defined terms as Sprint did in its moving brief. "Charter Defendants" refers to Charter Communications, Inc., Charter Communications Holdings, LLC, Spectrum Management Holding Company, LLC, Charter Communications Operating, LLC, and Bright House Networks, LLC ("Bright House"). "Charter" refers to Charter Communications, Inc., Charter Communications Holdings, LLC and Charter Communications Operating, LLC.

[2] Spectrum Management Holding Company, LLC did not exist until May 22, 2015. (Ex. 1, Abramov Decl. ¶ 5.)

entered into a transaction with TWC and Bright House before trial in the Kansas Action resulting in their combination, essentially the only thing left to do was to try the case. As such, Charter had no ability to develop the record—including claim construction, fact discovery and expert discovery—on which the issues would be tried. Now Sprint seeks to assert a damages claim against the Charter Defendants while depriving them of the ability to present any invalidity defense or dispute infringement of the Broadband Patents based on the mere happenstance that Charter acquired TWC and Bright House over three and half years after Sprint brought the Kansas Action. Because the Charter Defendants were not parties to and did not have control over the Kansas Action, the Kansas Action carries no preclusive effect over the issues in this case.

Moreover, even if the Court were to find that the Charter Defendants did have a meaningful chance to litigate the Kansas Action by virtue of the transaction shortly before the trial, they should still not be precluded from offering defenses that were never previously litigated. That is because the Kansas Action involved a different claim construction, different accused equipment, and different invalidity defenses from this case. For this reason as well Sprint's motion should be denied and Charter Defendants' concurrently-filed cross-motion granted.

### A.      Statement Of Facts

Sprint filed the Kansas Action against TWC on December 19, 2011. (Ex. 2, Kansas Action, D.I. 1.) Over the course of the next three years and ten months, the parties completed claim construction, fact and expert discovery and most of the summary judgment and *Daubert* briefing.[3] On May 26, 2015, Charter announced its intent to enter into a transaction with TWC and Bright House that would result in their combination. D.I. 461 ("Sprint MSJ") at 3. Before completing the

---

[3] *See* Ex. 3, Consolidated Kansas Action, D.I. 859 (pretrial order); Ex. 4, Consolidated Kansas Action, D.I. 525 (scheduling order); Ex. 5, Consolidated Kansas Action, D.I. 348 (scheduling order); Ex. 6, Consolidated Kansas Action, D.I. 168 (scheduling order); Ex. 7, Consolidated Kansas Action, D.I. 69 (scheduling order).

transaction, TWC, Bright House and Charter owned separate cable systems, therefore none of the Bright House or Charter systems were at issue in the Kansas Action. (Ex. 1, Abramov Decl. ¶ 6.)

Sprint states that during the one-year period between Charter's announcement and later completion of the transaction TWC continued to assert various defenses. TWC made this decision with no input from Charter which, as an independent company, had no power to provide any input to TWC on its handling of the Sprint case, and in fact exercised no direction or control over TWC or Bright House. (Ex, 1, Abramov Decl. ¶¶ 6-8.) Sprint, which must carry the burden of proof on its motion, did not offer any evidence—let alone undisputed evidence—to the contrary.

Judge Lungstrum stayed the Kansas Action pending an appeal in the Cox case on October 8, 2015. (Ex. 8, Consolidated Kansas Action, D.I. 917; Ex. 9, TWC Kansas Action, D.I. 123.)  On May 18, 2016, during pendency of the stay, Charter purchased TWC and Bright House. Sprint MSJ at 3. Judge Lungstrum lifted the stay on October 5, 2016 and set TWC for trial on February 13, 2017. (Ex. 10, Consolidated Kansas Action, D.I. 926.)  Charter was not a party to the Kansas Action; had no ownership interest in or control over TWC during fact discovery, claim construction and preparation of the experts or expert discovery; and had no ability to control the defenses available to TWC for trial. (Ex. 1, Abramov Decl. ¶¶ 6-8.) Prior to Charter completing the transaction, TWC had developed its case for trial and made decisions that could not be undone.

In the present case, the Charter Defendants have developed different enablement defenses, different written description defenses based on different claim constructions by this Court, different prior art defenses based on different prior art, and different non-equivalence, non-infringement defenses based on equipment that was never at issue in the Kansas Action.

### B.    Legal Standard For Issue Preclusion

"Third Circuit law governs the application of issue preclusion generally, and Federal Circuit law governs those aspects of issue preclusion 'that may have special or unique application

for patent cases.'" *Orexo AB v. Actavis Elizabeth LLC*, 371 F.Supp.3d 175, 181 (D. Del. 2019).

Sprint, "[a]s the party asking the court to apply issue preclusion . . . bears the 'burden of

demonstrating the propriety of its application.'" *Id.* The Third Circuit has set forth the requirements

for issue preclusion: "(1) the identical issue was previously adjudicated; (2) the issue was actually

litigated; (3) the previous determination was necessary to the decision; and (4) the party being

precluded from relitigating the issue was fully represented in the prior action." *Jean Alexander*

*Cosmetics, Inc. v. L'Oreal USA, Inc*., 458 F.3d 244, 249 (3d Cir. 2006) (quoting *Henglein v. Colt*

*Indus. Operating Corp.*, 260 F.3d 201, 209 (3d Cir. 2001)).

### C.    The Charter Defendants, As Nonparties, Were Not "Fully Represented" In The Kansas Action

Sprint's entire motion fails, as it cannot satisfy the "fully represented" element of issue

preclusion. *See Jean Alexander Cosmetics*, 458 F.3d at 249. There is a "general rule against

precluding nonparties" to prior actions, such as the Charter Defendants, with "discrete exceptions

that apply in 'limited circumstances.'" *Taylor v. Sturgell*, 553 U.S. 880, 884, 898 (2008) (citation

omitted). The Supreme Court identified six exceptions, but Sprint relies on only three: the

"substantive legal relationship," "represented by someone with the same interests" and "assumed

control" exceptions. *Id.* at 893-95; Sprint MSJ at 8-12. None of these apply.

### 1.    The "Substantive Legal Relationship" Exception Does Not Apply

Sprint claims that the "substantive legal relationship" exception applies because Charter

and TWC are "preceding and succeeding owners of property." Sprint MSJ at 9. But this exception

is sharply limited to subsequent actions involving the ***same*** property. *See Int'l Nutrition Co. v.*

*Horphag Research Ltd.*, 220 F.3d 1325, 1329 (Fed. Cir. 2000)  ("[W]hen one party is a successor

in interest to another with respect to particular property, the parties are in privity only with respect

to an adjudication of rights in the property that was transferred; they are not in privity for other

4

purposes, such as an adjudication of rights in other property that was never transferred between the two.")  The property at issue in the Kansas Action and that at issue here are not the same.

Sprint does not and cannot accuse in this case the TWC systems that it accused in the Kansas Action. Sprint therefore cannot prevail on the "substantive legal relationship" exception. *See Power Integrations, Inc. v. ON Semiconductor Corp.*, 396 F.Supp.3d 851, 878 (N.D. Cal. 2019) ("ON is not in privity with Fairchild because this action does not involve products that ON acquired from Fairchild. Because ON had the independent right to challenge the validity of PI's patents with respect to its own products before it acquired Fairchild, it maintained that right even after it acquired Fairchild's infringing products."); *Endo Pharms, Inc. v. Actavis Inc.*, No. 14-1381-RGA, 2017 WL 3731001, at *3 (D. Del. Aug. 30, 2017)  (Andrews, J.) (same); *Crossroads Sys. (Texas), Inc. v. Dot Hill Sys. Corp.*, No. A-03-CA-754-SS, 2006 WL 1544621, at *7 (W.D. Tex. May 31, 2006) (same); *Pall Corp. v. Fisher Sci. Co.*, 962 F. Supp. 210, 213-214 (D. Mass 1997) (same).

### 2. The "Represented By Someone With The Same Interests" Exception Does Not Apply

Regarding the "represented by someone with the same interests" exception, Sprint argues that Charter was represented in the Kansas Action by TWC, which acted in a "fiduciary capacity" with respect to Charter. Again, Sprint goes too far. The Supreme Court explained that this exception applies in cases with "properly conducted class actions, . . . and suits brought by trustees, guardians, and other fiduciaries." *Taylor*, 553 U.S. at 894-95 (citing *Martin v. Wilks*, 490 U.S. 755, 762, n. 2 (1989) and *Sea-Land Servs., Inc. v. Gaudet*, 414 U.S. 573, 593 (1974)). By "fiduciary," the Court was not referring to a general fiduciary relationship; it referred specifically to "a party who acts as a fiduciary representative for the beneficial interest of the nonparties" with respect to the subject matter of the lawsuit. *Gaudet* at 414 U.S. at 593, 594 ("when a decedent brings his own

personal-injury action during his lifetime and recovers damages for his lost wages he acts in a fiduciary capacity" for his dependents to recover prospective earnings). Sprint makes no attempt to satisfy the necessary showing that TWC owed Charter fiduciary responsibility with respect to the conduct of the Kansas Action and acted as its representative.

As for Bright House, Sprint merely argues that pre-merger, (1) TWEAN and Bright House shared a common legal interest in the outcome of the litigation and (2) that TWEAN was "Bright House's 'affiliate,' and parent." Sprint MSJ at 10. But a common interest by itself is not sufficient. "[A]t a minimum," *in addition* to an "align[ment]" of the party and nonparty's interests, the party must have "understood herself to be acting in a representative capacity [of the nonparty] or the original court took care to protect the interests of the nonparty." *Taylor* 553 U.S. at 900 (citations omitted). The mere existence of a corporate relationship does not mean that a party is acting as a "fiduciary representative" of a nonparty and Sprint cites no authority suggesting otherwise. Nor does it identify any facts other demonstrating that TWEAN was acting as Bright House's "fiduciary representative" in the Kansas Action. "Nothing in the record indicates that" TWEAN understood itself to be litigating on Bright House's "behalf" or that the Kansas "District Court took special care to protect" Bright House's interests. *Taylor,* 553 U.S. at 905.[4]

As for Charter, Sprint does not even attempt to argue that TWC represented Charter pre-merger, therefore Charter could not have received "adequate representation" within the meaning of the *Taylor* exception. Sprint argues that "post-merger, the remaining TWC Defendants" owed Charter a "fiduciary duty" as its subsidiaries. Sprint MSJ at 10. But such hand waving is not sufficient. *See Taylor* at 900. Sprint utterly fails to show that TWC "understood" itself to be

---

[4] Sprint makes no showing that TWEAN controlled Bright House or derived any direct economic benefit from Bright House's business. Although Charter Defendants do not bear the burden of disproving this, the only evidence shows TWEAN did not. (Ex. 11, Harrison Decl. ¶¶ 3-7.)

representing the Charter Defendants or that the Judge Lungstrum took any precautions to protect the interests of any nonparties (such as in a class action). *See Endo*, 2017 WL 3731001, at *3 (finding Teva's acquisition of Actavis two years after Endo sued both separately for infringement did not mean that the Actavis Defendants were "represented" in the Teva suit).[5]

### 3.    The "Assumed Control" Exception Does Not Apply

Sprint's third argument—that Charter assumed control over the Kansas Action—fails as well. Issue preclusion may bind a nonparty if it "assume[d] control over the litigation in which that judgment was rendered . . . [b]ecause such a person has had the opportunity to present proofs and argument." *Taylor*, 553 U.S. at 895 (first alteration in original) (internal quotations and citation omitted). Assuming that Charter gained "control" over the Kansas Action post-merger in the months leading up to trial, such control did not and could not translate into a full and fair "opportunity to present proofs and argument". *See Endo*, 2017 WL 3731001, at *3 ("I fail to see how I could preclude the Actavis Defendants from challenging the validity of this patent on the basis that a different party, who happened to acquire the Actavis Defendants long after this suit was filed, previously litigated the validity of the patent."); *Watts v. XL Sys., L.P.*, No. 1:06–CV–653–LY, 2008 WL 5731945, at *11 (W.D. Tex. July 2, 2008) ("Any control over the previous litigation exercised by Grant can only have occurred well into the previous litigation as Grant acquired XL three years after the litigation had begun and after all discovery was completed. . . .

---

[5] Citing no legal authority, Sprint also argues Charter was "represented by counsel in the prior [Kansas] action, including counsel who represent Charter and its subsidiary Bright House in this matter." Sprint MSJ 8. This is entirely irrelevant to the *Taylor* exceptions. Moreover, counsel of co-defendants, not TWC, handled the Section 112 expert that resulted in abandoning any opinions on enablement. Ex. 12, 6/19/15 Min Dep. Tr. at 3:7-10, 14:8-18.

The evidence offered by Watts shows some involvement by Grant in the litigation, but it fails to show that Grant had 'effective choice as to the legal theories and proofs to be advanced.'")[6]

Indeed, "[t]o have control of litigation requires that a person have effective choice as to the legal theories and proofs to be advanced in behalf of the party to the action. He must also have control over the opportunity to obtain review." *Marshak v. Treadwell*, 240 F.3d 184, 195 (3d Cir. 2001) (quoting Restatement (Second) of Judgments § 39 cmt. c). Once claim construction, fact and expert discovery and the bulk of the summary judgment briefing had been completed, all of the most important decisions in the litigation had already been made. *Supra*, Section III.A.[7] Merely making decisions about how to try a case previously developed by an independent actor does not constitute having "effective choice as to the legal theories and proofs." Charter had no opportunity to present an enablement defense because enablement had been waived prior to Charter's completing its combination, and had no opportunity to choose the prior art it would rely on for its §§ 102 and 103 defenses or participate in claim construction in the Kansas Action.[8]

### D. No Determination In The Kansas Action Precludes The Charter Defendants In The Present Case

---

[6] Sprint's reliance on *Astrazeneca UK Ltd. v. Watson Labs, Inc.*, 905 F. Supp. 2d 596 (D. Del. 2012) is misplaced. In that case "the parties have stipulated that Watson's parent's 'control' over Cobalt has the same meaning as set forth in" the *Taylor* "assumed control" exception. *Id.* at 603. There is no such stipulation here.

[7] Sprint argues Charter's control over the litigation is evidenced by its attempt to "substitute itself into the case." Sprint MSJ at 11. Sprint ignores that it opposed this request (D.I. 462, Ex. I, 10/9/2016 Email From J. Ryan), and no substitution ever occurred. Moreover, the request was solely made to preclude Sprint from arguing there was no right of appeal due to the TWC entities no longer existing. *Id.* It sheds no light on whether Charter exercised effective control over the Kansas Action given the late stage of the case at the transaction's completion.

[8] For example, TWC never put forth expert opinions on the following references that Charter now relies on for is prior art based defenses: Bolliger, Madonna, Hiller '636, Hiller '445, Ambrosch, Russell, Q.700, Q.702, and Q.705. (Ex. 13, Haas Op. Rpt. at §§ XI.B, XI.C.2, XI.C.4-7, XII; Ex. 14, Houh Reply Rpt. at §§ V.B-E, V.G.)

Sprint does not dispute there can be no preclusion if it cannot satisfy any of the *Taylor* exceptions. As explained in the proceeding section, none of the *Taylor* exceptions apply; therefore, for this reason alone, Sprint's motion should be denied. Even if the Court finds otherwise, the Charter Defendants should not be precluded from seeking adjudication of different issues.

### 1. TWC's Litigation Of Any Invalidity Issue In The Kansas Action Does Not Preclude The Charter Defendants From Litigating A Different Invalidity Issue Here

Sprint argues that validity is a single issue and that litigation of any validity issue on any grounds precludes litigating validity on any other grounds. Sprint MSJ at 6-8. But validity is not the monolith that Sprint's argument supposes. The Supreme Court has described invalidity as involving multiple issues in the context of discussing issue preclusion based on a prior determination of invalidity. *See Blonder-Tongue Labs, Inc. v. Univ. of Illinois Found.*, 402 U.S. 313, 332 n.23 (1971) (referring to validity "issues" in the plural and explaining "[i]t cannot be sensibly contended that *all issues* concerning patent validity are so complex and unyielding."); *Orexo*, 371 F. Supp. 3d at 184 ("The Court's analysis in *Blonder-Tongue* makes clear that it understood invalidity to encompass multiple issues for purposes of issue preclusion.")

Sprint concedes that the Federal Circuit "has not directly addressed whether validity is a single issue for estoppel purposes." Sprint MSJ at 6-7.[9] Although the Third Circuit has not resolved

---

[9] Sprint's argument that the Federal Circuit in *Dana v. E.S. Originals, Inc.* "indicates that validity is a single issue" is wrong. 342 F.3d 1320, 1325 (Fed. Cir. 2003). In that case, the Federal Circuit never addressed the issue of whether litigating one invalidity issue precludes litigating another invalidity issue in a subsequent case. *Id.*; *see also Orexo* 371 F. Supp. 3d at 183 ("Neither the Third Circuit nor the Federal Circuit has addressed whether validity is a single issue for estoppel purposes."); 6 Annotated Patent Digest § 38:46 ("The Federal Circuit [in *Dana*] never expressly addressed any arguments that issue preclusion barred a new ground of invalidity not raised in the prior action, since the accused infringer never asserted that it was raising any new grounds of invalidity. Hence, it seems incorrect to read *Dana* as supporting the proposition that a new ground for invalidity, as opposed to new evidence to support a ground of invalidity previously asserted unsuccessfully, raises the "identical issue" for purposes of collateral estoppel.")

this question directly, it has set forth criteria (that Sprint ignores) for determining whether two issues are "identical" for purposes of issue preclusion. The party asserting estoppel must show "that the same general legal rules govern both cases and that the facts of both cases are indistinguishable as measured by those rules." *Suppan v. Dadonna*, 203 F.3d 228, 233 (3d Cir. 2000). That is plainly not the case for the multitude of different patentability requirements that must be satisfied. *See Orexo* at 185-186 (discussing the different requirements under §§ 101, 102, 103 and 112, and further discussing the differences between "indefiniteness, lack of enablement or lack of an adequate written description" under § 112 which are all "governed by different legal standards" and citing relevant authority).[10] Furthermore, patent cases also recognize the "the strong federal policy favoring the full and free use of ideas in the public domain," *Lear, Inc. v. Adkins*, 395 U.S. 653, 674 (1969), and the corresponding "well-established policy of freely allowing challenges to the validity of claimed intellectual property protection." *Nasalok Coating Corp. v. Nylok Corp*. 522 F.3d 1320, 1327 (Fed. Cir. 2008); *see also Orexo*, 371 F. Supp. 3d at 186.

Although courts outside this district treat validity as a single issue, these courts have not considered the guidance provided by the Supreme Court in *Blonder-Tongue*, the Third Circuit authority setting forth the requirements for determining identity of issues and the actual differences in the various legal requirements for patentability, as well as the established public policy of "freely allowing challenges to" patent validity. Within the District of Delaware, this Court, as well as Judge Connolly in *Orexo* (which Sprint failed to cite), have rejected the idea that validity is a single issue for purposes of issue preclusion. *See TASER Int'l, Inc. v. Karbon Arms, LLC*, 6 F. Supp. 3d 510, 519 (D. Del. 2013) (Andrews, J.) ("[W]hile TASER treats the issue of validity as one issue,

---

[10] Chief Judge Stark has treated invalidity as a single issue in *Astrazeneca*, however that case did not apply the Third Circuit's criteria for determining identity of issues set forth in *Suppan*. 905 F. Supp. 2d at 602-03.

each theory of invalidity is a separate issue."); *Orexo*, 371 F. Supp. 3d at 186 ("I find that validity should not, as a matter of law, be treated as a single issue for estoppel purposes.").

> ### 2. There Is No Preclusion Because Charter Is Not Litigating The Same Issues That Were Tried In The Kansas Action
>
> #### a. Charter Is Not Litigating The Same Validity Issues Tried In The Kansas Action, Therefore There Is No Preclusion Of Invalidity
>
> ##### i. Enablement

Sprint argues that Charter should be precluded from asserting its enablement defense because TWC previously litigated written description. Sprint MSJ at 12-14. Although TWC pled lack of enablement in its answer and discovery responses, the issue was never adjudicated because, as Sprint admits, enablement was not presented to the jury. *Id.* at 12. In fact, post-merger there was no ability to present enablement to the jury because the defense had already been waived. (Ex. 12, P. Min Dep. Tr. at 24:9-18, 25:17-27:21).

To support its argument, Sprint relies on *VirnetX Inc. v. Apple Inc.*, 792 F. App'x 796 (Fed. Cir. 2019), a nonprecedential decision that in fact helps demonstrate that enablement was not "actually litigated" in the Kansas Action. Sprint also ignores the relevant Federal Circuit precedential decision, *Voter Verified*. These two cases make clear that to satisfy the "actually litigated" requirement for issue preclusion, the party to be precluded must be on notice that an adverse judgment on the issue could be entered, and the court must then enter such a judgment.

In *Voter Verified, Inc. v. Election Sys. & Software LLC,*, entry of summary judgment against a defendant's § 101 counterclaim was deemed "not actually litigated" where the defendant simply "chose not to respond" to the motion. 883 F.3d 1376,1380 & 1383 (Fed. Cir. 2012). Here, Sprint never sought or received any judgment on enablement. *VirnetX* also does not help. There, the district court "denied [Apple's] motion to dismiss" its invalidity defenses so that Apple "knew that the issues remained in the case" and then the court "entered judgment as a matter of law

rejecting all of Apple's other invalidity counterclaims." *VirnetX* at 792 F. App'x at 801, 804. TWC was never on notice that enablement (or any other untried defenses) would be adjudicated, nor did the court enter judgment on them. The *VirnetX* decision, if anything, demonstrates that enablement was *not* actually litigated in the Kansas Action.

### ii.   Section 112 Switch Defenses

Even if the Court finds that TWC "fully represented" the Charter Defendants and that invalidity should, in general, be treated as a "single issue," the Charter Defendants should still have an opportunity to present their enablement and written description defenses to the Call Control Patents based on the failure of those patents to describe or enable the switches needed to practice the claims. Issue preclusion, even for what would otherwise be the same issue, does not apply when there is an intervening change in the law, *see Voter Verified* 887 F.3d at 1381 ("if there were a change in the law, then issue preclusion would not apply. . . ."), or a change in a relevant claim construction, *see Allergan Sales, LLC v. Sandoz, Inc.*, 211 F. Supp. 3d 907, 915 (E.D. Tex. 2016) ("Application of issue preclusion to bar Sandoz from asserting new theories of invalidity under a new, broader claim construction of critical terms where new theories under § 112 are included would be inappropriate."); *TASER*, 6 F. Supp. 3d at 519 (quoting 6 Annotated Patent Digest § 38:46 ("if the invalidity theories are based on different claim constructions . . . the requirement of identicality is not satisfied.")); *LG Elecs. U.S.A., Inc. v. Whirlpool Corp*, No. 10–311–GMS, 2011 WL 4543886, at *3 (D. Del. Sept. 29, 2011) (denying motion to dismiss based on preclusion because "[a]s a result [of its redesign], LG was unable to actually litigate the new claim construction infringement and invalidity issues pertaining to the redesign").

In the present action, unlike in the Kansas Action, this Court entered a claim construction that required use of a switch to practice each of the asserted Call Control Patent claims.[11]  Although TWC presented a switch argument in the Kansas Action, it could not effectively make its argument because Judge Lungstrum did not construe the independent claims of the Call Control Patents as requiring any switch (ATM or otherwise). Sprint MSJ, Ex. Y at 15. Here, the Court ruled that the Call Control Patent claims require use of a switch. Therefore the specification's failure to disclose a suitable ATM, IP or other switch that can be used to perform the claimed methods represents new written description and enablement defenses that could not be meaningfully adjudicated previously under the prior court's constructions.[12]

### iii.    Prior Art

Sprint argues that TWC's assertion of the Vision O.N.E. art precludes assertion of different prior art here. (*Compare* Ex. 13, Haas Op. Rpt. at §§ XI.B, XI.C.2, XI.C.4-7, and XII (prior art references currently at issue are Bolliger, Hiller '636, Hiller '445, Madonna, Bartholomew, Ambrosch, Russell, Q.700, Q.702, and Q.705), *with* Ex. 21, Kansas Action, D.I. 447 at Jury Instruction Nos. 27-28 (prior art references at issue were "Larry Schessel's European patent application" and a "1991 Telecom Report").) Different prior art, however, presents different issues. *See TASER*, 6 F. Supp. 3d at 519 (quoting 6 Annotated Patent Digest § 38:46:  "if the

---

[11] Every asserted Call Control Patent claim requires use of a "packet communication system," "asynchronous communication system," "packet system," or "broadband network," all of which have been construed as a "system wherein packets are routed by network elements, wherein at least one network element is a switch." D.I. 304 at 3-4; Ex. 15, Almeroth Op. Rpt. ¶ 208; Ex. 16, Call Control Patents' Claim Language Excerpts; *compare with* Ex. 17, Kansas Action, D.I. 98 at 40-42 (declining to construe these terms).

[12] Ex. 15, Almeroth Rpt. at §§ VI.C & VII.G; Ex. 18, Almeroth Reply Rpt. at §§ V.B.3, V.C.2, & VI.F; Ex. 19, Frendo Rpt. at §§ VII – VIII; Ex. 20, Frendo Reply Rpt. at §§ II – III.

invalidity theories are based on . . . different prior art, the requirement of identicality is not satisfied.").

### 3. Charter Is Not Litigating The Same Equivalence Issues That Were Tried In The Kansas Action, Therefore There Is No Preclusion Of Equivalence

Sprint argues that the Charter Defendants' noninfringement defense based on nonequivalence should be precluded because Sprint received a judgment in the Kansas Action that TWC's systems infringed the Broadband Patents under the doctrine of equivalents. *See Sprint Commc'ns Co., L.P. v. Time Warner Cable, Inc.*, 760 F. App'x 977 (Fed. Cir. 2019). According to Sprint, the Kansas Action determined the issue of whether "IP media gateways are equivalents of an 'ATM interworking multiplexer'" and the "identical issue" must be determined here. Sprint MSJ at 14. Sprint is wrong. The Kansas Action determined that TWC's MGX 8880 is equivalent to an ATM interworking multiplexer. *Id*. It made no determination that any of the equipment Charter uses is equivalent to an ATM interworking multiplexer.

Although Sprint bears the burden of proving the issues in the Kansas Action and in this case are identical, it made no effort to meet this burden by comparing (or even mentioning the accused equipment in this case). Its motion fails for this reason alone. *See Suppan*, 203 F.3d at 233. Moreover, the record demonstrates that there are several indisputable differences between the equipment in both cases that are directly relevant to Sprint's equivalence theories:

- **ATM backplane**. Although the Cisco MGX 8880 used by TWC outputs IP, it uses an ATM backplane to encapsulate the IP into ATM cells as part of its process. (Ex. 22, TWC Trial Tr. at 689:17-690:6, 699:25-702:3). Sprint's expert, Dr. Wicker relied on the fact that the MGX 8880 "was designed to be an ATM box" and had "ATM on the backplane" as part of his infringement opinion for both literal and equivalence. (*Id*. at 701:6-702:14.)

- **Designed for swappable ATM/IP cards.** The MGX 8880 was card-configurable such that the IP interface card could be swapped with an ATM interface card. (*Id*. at 697:7-699:24). Dr. Wicker testified that facts demonstrating that the MGX 8880 was "specifically designed" so that you

14

could "change the cards" by swapping them out of the MGX 8880's chassis (depending on whether you wanted to "output IP packets" or "ATM packets") supported his "known interchangeability [equivalence] opinion." (*Id.* at 697:17-699:22.)

None of the Charter Defendants used an MGX 8880 during the damages period, or any other media gateways made by Cisco.[13] ██████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████ In addition, the Charter Defendants did not use any media gateways during this time that had an ATM backplane. ████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████ Nor has Dr. Wicker, Sprint's expert, identified any media gateway used by Charter during the damages period that had ATM backplanes or swappable IP and ATM interface cards.[14]

An adjudication that the MGX 8880 is equivalent to an ATM interworking unit does not demonstrate that other equipment made by different manufacturers with different internal architectures is also equivalent, and Sprint does not identify a single case holding otherwise. *See*

---

[13] Sprint sued Charter and Bright House for infringement of the Kansas Patents, and others, on December 1, 2017. The asserted damages period for the Kansas Patents runs from December 1, 2011 through May 2014, and was complete years before Charter acquired Bright House and TWC. (*See* Ex. 27, Mangum Rpt. at Mangum Exhibit 4.)

[14] He merely refers to the existence of an MGX 8880 used by others—but not the Charter Defendants. (*See* Ex. 28, Wicker Open. Rpt. ¶ 181; Ex. 23, Wicker Reply Rpt. ¶¶ 128, 141.)

*Power Integrations*, 396 F.Supp.3d at 878; *Endo*, 2017 WL 3731001, at \*3; *Crossroads*, 2006 WL 1544621, at \*7; *Pall Corp.*, 962 F. Supp. at 213-214.

## IV.   SPRINT'S MOTION FOR SUMMARY JUDGMENT OF NO INEQUITABLE CONDUCT SHOULD BE DENIED[15]

### A.   Call Control Patents: Sprint's Knowing And Repeated Misrepresentations About The Existence Of The ATM Switch Were Material

#### 1.   The Call Control Specification and Claims

According to Sprint, the inventions of the Asserted Patents are methods for connecting packet networks (referred to as "asynchronous networks") to the Public Switched Telephone Network ("PSTN," referred to as a "synchronous network") so that telephone calls can be made spanning the two different types of networks. D.I. 14 (Amended Complaint) ¶¶ 13-18. Although the claims of the Call Control patents have indeed been construed to cover connection to any type of packet network, the only disclosed embodiment of the invention employs an ATM packet network. D.I. 296 (Court's Claim Construction Order) at 19-22; Ex. 15 (Almeroth Op. Rpt.) ¶¶ 104-105; Ex. 18 (Almeroth Reply Rpt.) ¶¶ 64, 74; Ex. 22 (*Sprint v. TWC* 02/28/2017 Tr.) at 2744:15-22 (Sprint's expert Dr. Wicker agreeing that "the only examples of broadband networks . . . provided are ATM"); Ex. 29 (Declaration of Leonard J. Forys, Ph.D, dated July 15, 2019 ("Forys Declaration")) ¶¶ 55, 64, 78, 83; Ex. 31, ('3,561 Patent), at 2:28-36, Fig. 3.

According to the Call Control specification, the reason ATM networks could not connect to the PSTN is that the two networks use incompatible switches. (Ex. 31, ('3,561 Patent) at 2:28-37, 2:54-3:20.) PSTN switches receive and process signaling from one another to set up calls through the PSTN. (*Id.* at 1:56-2:4.) Similarly, the specification alleges ATM switches existed that could receive and process signaling to set up calls through ATM networks. (*Id.* at 2:28-36.) However, ATM switches were said to be unable to signal PSTN switches (and vice versa) as would

---

[15] Section IV is submitted on behalf of all Defendants.

be required to set up calls that span both an ATM network and the PSTN. (*See, e.g.*, *id.* at 3:10-15; Ex. 15 (Almeroth Op. Rpt.) ¶¶ 217-221; Ex. 18 (Almeroth Reply Rpt.) ¶¶ 177-78; Ex. 29 (Forys Decl.) ¶¶ 75-90).

To solve this problem, the specification proposes a new device called a "Communication Control Processor" (CCP) that has the ability to signal both ATM switches and PSTN switches, as necessary, to set up calls that traverse both ATM and PSTN networks. (Ex. 31 ('3,561 Patent) at 3:28-31; 5:29-32, Fig. 3, 10:7-17, 11:38-42, 11:58-12:60 (depicting and discussing the allegedly novel CCP for signaling the broadband and narrowband switches); Ex. 15 (Almeroth Op. Rpt.) ¶¶ 79-86; Ex. 29 (Forys Declaration) ¶¶ 75-90). For this invention to work, ATM switches had to already exist which could receive and process the signaling from the CCP to set up calls. Consequently, Sprint repeatedly represented to the United States Patent and Trademark Office ("USPTO") that such ATM switches existed as off-the-shelf devices, and that "the Fore Systems ASX-100" was an example of such an ATM switch as of the May 5, 1994 priority date. (Ex. 30 at 00003540, 00003665-82; Ex. 32 at 00002577; Ex. 15 (Almeroth Op. Rpt.) ¶¶ 397, 402).  Between 1994 and 2006, through a series of continuation applications, Sprint repeated this representation to the USPTO at least six (6) times. (Ex. 15 (Almeroth Op. Rpt.) ¶¶ 397, 402). As discussed below, all of these representations were false—these ATM switches did *not* exist.[16] The nonexistent ATM

---

[16] In fact, *no* packet switches existed, ATM or otherwise, that could perform the functions required by the specification or the claims, and making such a switch would require undue experimentation. (Ex. 15 (Almeroth Op. Rpt.) at §§  VI.C.3, VI.C.5, VIII.B; Ex. 18 (Almeroth Reply Rpt.) at §§ V.C.2, VI.A; Ex. 19 (Frendo Op. Rpt.) at §§  VII - VIII; Ex. 20 (Frendo Reply Rpt.) at §§  II - III). Although a device called the Fore Systems ASX-100 existed, it was not an ATM switch that could perform the functions described in the specification or the disclosed embodiment and the claims. (Ex. 15 (Almeroth Op. Rpt.) ¶¶ 106, 217-221, 231-32, 246, 298, 375, 397-402 (citing at least 6 instances where Sprint or Christie conceded that the technology did not yet exist); Ex. 18 (Almeroth Reply Rpt.) ¶¶ 83, 130, 177, 222; Ex. 19 (Frendo Op. Rpt.) ¶ 55; Ex. 20 (Frendo Reply Rpt.) ¶ 22; Ex. 36 (M. Frendo Dep. Tr.) at 242:25-244:10).

switch is the only packet switch disclosed in the specification. (Ex. 31 ('3,561 patent), 10:11-17;

Ex. 22 (*Sprint v. TWC* 02/27/17 Tr.) at 2098:12-18; 2091:6-2092:17, 2746:3-13 (Dr. Wicker

agreeing that the only example of "an actual broadband switch that somebody could purchase"

was "an ATM broadband switch"); Ex. 15 (Almeroth Op. Rpt. ¶¶ 106, 375); Ex. 18 (Almeroth

Reply Rpt.) ¶¶ 130, 202-03, 205).

Because of the central role the switches play in the disclosed embodiment, the Court

construed all of claims of Call Control patents to require a packet switch. D.I. 296 (Court's Claim

Construction Order) at 19-20. However, because the claims were not limited to ATM, the Court

did not limit that packet switch to the disclosed ATM packet switch. *Id.* Thus, the claims cover the

disclosed ATM switch as well as other packet switches not mentioned in the specification.

### 2.     Sprint's Misrepresentations Were Material To The Patentability Of The Claims Of The Call Control Patents As Construed

The evidence is overwhelming that all of Sprint's representations about the existence of

the ATM packet switch were false, and that Sprint knew they were false when they made those

representations. (Ex. 34 (U.S. Patent No. 5,991,301) at 1:60-63, 2:58-61 (first applied-for

Broadband Patent); Ex. 33 (3/26/15 M. Gardner Dep. Tr.) at 170:6-12; Ex. 35 (1/7/20 M. Gardner

Dep. Tr.) at 40:24-41:4, 72:6-9, 74:21-24; Ex. 37 (1/28/20 W. Wiley Dep. Tr.) at 71:20-72:2; Ex.

38 (1/17/20 A. Duree Dep. Tr.) at 92:10-19; Ex. 39 at 00095; Ex. 40 at 00004022-23; Ex. 41 at

00946-47; Ex. 15 (Almeroth Op. Rpt.) ¶¶ 106, 217-221, 231-32, 246, 298, 375, 397-402; Ex. 18

(Almeroth Reply Rpt.) ¶¶ 65, 83, 130, 177-78, 222). Sprint's motion does not dispute this. Nor

does Sprint dispute that its misrepresentations would be material to patentability if the claims had

been limited to the disclosed ATM packet switch, or that the USPTO would have rejected such

claims for failure to satisfy the enablement and written description requirements had it known the

ATM switch did not exist. Instead, Sprint argues that those knowing misrepresentations cannot be

material to the enablement or written description of the issued claims as a matter of law because Sprint claimed its invention more broadly so as to cover both the nonexistent ATM packet switch and other undisclosed packet switches. Sprint is plainly wrong.

As an initial matter, claiming more broadly than the disclosed embodiment *increases* an inventor's disclosure obligations because the full scope of the claims must be enabled and adequately described, not just the disclosed embodiment. *Auto. Techs. Int'l, Inc. v. BMW of N. Am., Inc.*, 501 F.3d 1274, 1285 (Fed. Cir. 2007); *Abbvie Deutschland GmbH & Co., KG v. Janssen Biotech, Inc.*, 759 F.3d 1285, 1298 & 1300 (Fed. Cir. 2014). Sprint's argument, in effect, is that the exact opposite is true. As Sprint would have it, by claiming more broadly (all packet switches) than its disclosed embodiment (ATM packet switches), Sprint actually *decreased* its disclosure obligation such that it was not required to satisfy the enablement and written description requirements *even for the disclosed embodiment*. That does not make sense, and it is not the law.

Moreover, Defendants are not even required to separately establish materiality because Sprint's knowing and repeated false representations to the USPTO constitute egregious misconduct. Sprint's misrepresentations are therefore deemed to be material as a matter of law because "a patentee is unlikely to go to great lengths to deceive the USPTO with a falsehood unless it believes that the falsehood will affect issuance of the patent." *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1292 (Fed. Cir. 2011) (en banc).

For these reasons, Sprint's request for summary judgment that its knowing and repeated misrepresentations to the USPTO were immaterial to patentability must be denied.

**B.    Broadband Patents: Sprint's Failure To Disclose Its Inability To Make The Disclosed Embodiment Was Material**

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████ Yet Sprint never disclosed these failures to the USPTO. If it had, the USPTO would have rejected the Broadband patent claims for failure to satisfy the enablement requirement.

Sprint's motion that these failures to disclose were not material is predicated entirely on the allegedly "incontrovertible" fact that the prototype was a successfully-built embodiment of the claimed invention. Not only *is* this fact controverted, the overwhelming weight of the evidence is that the prototype did *not* work and was *not* an embodiment of the claimed invention.

Sprint relies on the self-serving litigation testimony of its employees for its contention that the prototype worked. D.I. 464 at n.5. However, it ignores the mountain of evidence that the prototype did not work. For example, Douglas Shriver, a third-party unbiased employee of Cisco, testified that ███████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████

          ███████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████ ████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████    Sprint's contention in this litigation that the prototype was a successful embodiment of the invention contradicts what it told its accountants and the Internal Revenue Service when attempting to get tax credits for the project.

And even if the prototype did work, it was *not* an embodiment of the claimed invention. Sprint contends the invention is a way to connect a packet network to the PSTN. ████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████

In short, Sprint's factual contention that it successfully built a prototype of the invention of the Broadband patents is not just contested, the weight of the evidence is to the contrary. Because Sprint's motion is entirely predicated on this disputed question of fact, the motion must be denied.

### C.      Sprint's Motion For Summary Judgement Of No Specific Intent Must Be Denied

Sprint contends that it is entitled to summary judgement of no inequitable conduct because "the most reasonable inference" from its massive misconduct is not an intent to deceive. For example, even though Sprint's employees knowingly and repeatedly misrepresented to the USPTO that the ATM switch required by the Call Control patents existed, Sprint speculates that they may have believed they were allowed to deceive the USPTO if they believed the things they were deceiving the USPTO about were immaterial to patentability. Even if that could be established at trial, that is an outright concession that they *did* have an intent to deceive. Their supposed subjective belief that they were allowed to intentionally deceive the USPTO is irrelevant.

With respect to the Broadband patents, Sprint speculates that its employees may have subjectively believed that the prototype was a successful embodiment of the invention even though, at the very same time they allegedly believed this, Sprint was telling the Internal Revenue Service that Sprint could not make the invention. It cannot be "the most reasonable inference" that someone had a subjective belief that contradicts all the contemporaneous objective evidence.

In any event, because of the inherently factual nature of intent, it is not an issue that can ordinarily be decided on summary judgment. *Digital Control, Inc. v. Charles Mach. Works*, 437 F.3d 1309, 1317 (Fed. Cir. 2006) (describing summary judgment on inequitable conduct as "uncommon" in view of the "inherently factual nature of the issue of intent"). Because "direct evidence of deceptive intent is rare, a district court may infer intent from indirect and

circumstantial evidence," such as the overwhelming indirect and circumstantial evidence described above. *Therasense*, 649 F.3d at 1290.  At this summary judgment stage, that "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. With respect to the Call Control patents, then, the Court should infer intent to deceive from Sprint's knowing and repeated misrepresentations about the existence of the ATM switch (indeed, these falsehoods were so flagrant that it is actually Defendants that should be entitled to summary judgment that there *was* an intent to deceive, particularly in view of the fact that the only explanation Sprint offers is that their employees believed they were allowed to misrepresent facts to the USPTO). The Federal Circuit has vacated a summary judgment of no intent where the patentee made "misrepresentations and misleading statements that were directly refuted by credible evidence that [the patentee] did not otherwise disclose." *Ohio Willow Wood Co. v. Alps S., LLC*, 735 F.3d 1333, 1351 (Fed. Cir. 2013). Sprint's behavior was even worse, as there is no dispute that the required ATM switch did not exist.

Similarly with respect to the Broadband patents, the Court should infer intent to deceive from Sprint's failure to disclose to the USPTO what it did disclose to the IRS—that *Sprint itself was unable to make the invention*. Certainly, a reasonable fact-finder could find that the intent to deceive is a more reasonable inference than subjectively believing the prototype worked notwithstanding all of the objective evidence. *Helios Software, LLC v. Awareness Techs., Inc.*, No. 11-1259-LPS, 2015 WL 12806482, at *13 (D. Del. Apr. 13, 2015) (denying summary judgement of no inequitable conduct where patentees failed to disclose *their own potentially material prior art*—even though they submitted statements that they did not believe the art was relevant—because "a reasonable fact finder could find, by clear and convincing evidence, that intent to deceive is the single most reasonable inference"); *see also Bristol-Myers Squibb Co. v. Teva Pharm. USA, Inc.*,

No. 10-805-RGA, 2012 WL 2951965, at *2 (D. Del. July 19, 2012) (Andrews, J.) (denying summary judgment of no intent based on inventor and attorney testimony that they did not believe prior art was relevant because "it would require that I find the testimony [] credible").[17]

## V. SPRINT'S EQUITABLE DEFENSES MOTION SHOULD BE DENIED

Sprint seeks summary judgment on Charter's equitable defenses of license, acquiescence, waiver, unclean hands, exhaustion, and equitable estoppel by asking this Court to be the first court to expand the Supreme Court's holding in *SCA Hygiene* to apply to all equitable defenses in patent cases. But *SCA Hygenie* relates to laches only, and Charter is not pursuing a laches defense. Charter is pursuing defenses of license,[18] acquiescence, waiver, and unclean hands.[19] And Charter has identified evidence from which a reasonable trier of fact could find the elements of those defenses are met, namely Sprint's delay in filling suit, despite having knowledge of all material facts since the early 2000s, and Sprint's misrepresentations to the USPTO to obtain the Asserted Patents. As Sprint's motion is contrary to law and ignores the evidence that creates a genuine dispute of material fact, Sprint's motion should be denied.

### A.    Factual Background

#### 1.    Sprint Delayed In Filing Suit Against Charter/BHN Despite Knowing Of All Potentially Relevant Facts Of The Alleged Infringement

---

[17]   WoW, Grande and ABB are not pursuing their inequitable conduct argument regarding Sprint's failure to disclose the Tsuboi reference. D.I. 464 at 8-10. Moreover, Defendants have not responded to Sprint on the issue of inequitable conduct based on the incorporation of the Call Control specification into the Broadband specification by reference. D.I. 464 at 3-4. The Court has already found that this cannot constitute but-for materiality. D.I. 102 at 7.

[18]   Charter's license defense is based on Sprint's participation in standards settings organizations, and summary judgment for any defense based on that conduct is inappropriate because Sprint explicitly stated it was not seeking summary judgment on that basis. D.I. 461 at 16, n.13.

[19]   The remaining defenses are exhaustion, and equitable estoppel. Based on the Accused Products, Charter withdraws its defense of exhaustion, thereby mooting Sprint's summary judgment motion of no exhaustion. Charter already withdrew its equitable estoppel defense, (D.I. 138 at 2), and Sprint's motion on that defense is moot too.

24

Since the early 2000s, Sprint has known that BHN and Charter offered VoIP services.

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████ ███████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████

███████ ████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████ In fact, Sprint has alleged that its patents are "fundamental" "blocking"

patents that, according to Sprint, are infringed by any PSTN to packet network. (Ex. 27, (Mangum

Rpt.) at ¶¶ 28-29, 90). ███████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

25

███████████████████████████████████████

██████████████████████████.[20]

### 2.   Sprint Obtained The Asserted Patents Through Misrepresentations

Charter explained that "Sprint's inequitable conduct in the prosecution of the" Asserted Patents was the basis for its unclean hands defense. (Ex. 70, 4/17/19 Charter Resp. to Sprint's Interrogatory No. 11 at 85.) As explained above in opposition Sprint's motion regarding inequitable conduct, Sprint consistently and intentionally misrepresented or hid facts from the USPTO to obtain the Asserted Patents. *See supra*, Section IV.

### B.   Legal Standard

**Acquiescence  &  Waiver:** "A party is deemed to have acquiesced when it 'has full knowledge of his rights and the material facts and [] remains inactive for a considerable time; or . . . acts in a manner inconsistent with the subsequent repudiation, which leads the other party to believe the act has been approved." *Sonos, Inc. v. D&M Holdings Inc.*, C.A. No. 14-1330-RGA-MPT, 2016 WL 4249493, at *5-6 (D. Del. Aug. 10, 2016) (citing *Klassen v. Allegro Dev. Corp.*, 106 A.3d 1035, 1047 (Del. 2014)). Waiver can be shown either by evidence that a patent owner "with full knowledge of the material facts, [engaged in] conduct was so inconsistent with an intent to enforce its rights as to induce a reasonable belief that such right has been relinquished." *Qualcomm Inc. v. Broadcom Corp.*, 548 F.3d 1004, 1020 (Fed. Cir. 2008).

Courts have found that acquiescence and waiver can be established by a delay in filing suit despite knowing of all material facts, because that delay constitutes "silence or inaction [that is]

---

[20] 

inconsistent with an intent to enforce its rights." *Mars, Inc. v. TruRx LLC*, No. 6:13-cv-526-RWS-KNM, 2016 WL 4055676 at *1 (E.D. Tex. Apr. 29, 2016) (denying summary judgment of no implied waiver because material dispute as to whether Plaintiff's delay in filing suit was inconsistent with intent to enforce right); *Am. Tech. Ceramics Corp. v. Presidio Components, Inc.*, No. 14-CV-6544(KAM)(GRB), 2018 WL 1525686, at *26-29 (E.D.N.Y. Mar. 27, 2018) (denying summary judgment of no waiver for ten year delay in filing suit); *JumpSport, Inc. v. Acad., Ltd.*, No. 6:17-CV-414-RWS-JDL, 2018 WL 10124888, at *4 (E.D. Tex. Sept. 6, 2018) (recommending denying summary judgment of no acquiescence or waiver because "Defendants' allegations relating to Plaintiff's alleged knowledge of the sale of accused products and delay in bringing suit could potentially give rise to defenses of acquiescence and waiver")

**Unclean Hands**:  While the doctrines of inequitable conduct and unclean hands differ in terms of available remedies and scope, both defenses can be shown by "affirmative acts of misconduct intended to deceive [] the PTO." *Therasense*, 649 F.3d at 1287. As a result, courts routinely decide the two matters together. *E.g., Cheng v. AIM Sports, Inc.*, No. CV-10-3814-PSG (PLAx), 2012 WL 12953831, at *4 (C.D. Cal. May 14, 2012) (denying summary judgment of no unclean hands because the "holding regarding [the] defense of inequitable conduct is equally applicable to the defense of unclean hands.").

### C.    Argument

#### 1.    There Is A Genuine Dispute As To Whether Sprint's Delay Constitutes Acquiescence Or Waiver

Sprint argues it is entitled to summary judgment on Charter's acquiescence and waiver defense solely because, according to Sprint, the Supreme Court's decision in *SCA Hygiene* held that a "delay[] in filing suit" is "insufficient to support any claim of equitable relief." D.I. 461 at 17. Sprint is wrong. *SCA Hygiene* is a case about laches, and did not mention or address acquiescence or waiver. *SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC*, 137

S. Ct. 954, 959 (2017) (noting the issue was "the relationship between the equitable defense of laches and claims for damages that are brought within the time allowed by a statute of limitations"). Indeed, Sprint already attempted this argument in this case regarding a discovery dispute related to Charter's acquiescence defense, but Special Master Terrell rejected it, holding that: "Citing a recent Supreme Court case [*SCA Hygiene*], Sprint argues that an accused infringer can not [sic] escape liability for delay in prosecuting a claim. Charter offers a different interpretation of [*SCA Hygiene*], to which I agree. The Supreme Court case can be read to be limited to laches, rather than to an acquiescence defense." D.I. 398 at 5. Sprint never appealed the Special Master's interpretation of *SCA Hygiene* for good reason: it was correct.

Similarly, other courts have either explicitly or implicitly rejected Sprint's argument. *E.g. Oil-Dri Corp. of Am. v. Nestle Purina Petcare Co..*, No. 15-C-1067, 2019 WL 861394, at *7 n.5 (N.D. Ill. Feb. 22, 2019) (denying summary judgment of no acquiescence because Defendant "correctly point[ed] out in its response…that *SCA Hygiene* did not concern acquiescence."); *JumpSport*, 2018 WL 1012488, at *4 (finding delay in bringing suit creates a material factual dispute for acquiescence and waiver a year after *SCA Hygiene* was decided).

Once Sprint's erroneous interpretation of *SCA Hygiene* is set aside, it is clear there are genuine disputes of material fact precluding summary judgment of Charter's acquiescence and waiver defenses. There is evidence from which a trier of fact could reasonably conclude that (1) Sprint knew of its rights and material facts on which to base its lawsuit against Charter and BHN as early as 2003/2004 (*see supra*, Section V.A.1), and (2) Sprint's choice to engage in business with Charter/BHN, instead of filing a lawsuit, for fourteen years was "a considerable time" to "remain inactive" such that it constitutes acquiescence to Charter's use of the allegedly infringing technology and waiver of any infringement claims. *Sonos,* 2016 WL 4249493, at *5-6; *Klassen*,

106 A.3d 1035, 1047; *JumpSport*, 2018 WL 1012488, at *4. Based on this evidence, the trier of

fact could conclude that Sprint's silence and inaction was "so inconsistent with an intent to enforce

its rights as to induce a reasonable belief that [Plaintiff] had relinquished its rights." *Mars*, 2016

WL 4055676 at *2; *JumpSport*, 2018 WL 1012488, at *4. As a reasonable trier of fact could

conclude that Charter has proven acquiescence and waiver, the Court should deny Sprint's motion.

### 2.    There Is A Genuine Dispute As To Whether Sprint's Misrepresentations To The USPTO Constitute Unclean Hands

Sprint makes no effort to explain why there is no genuine dispute of material fact of no

unclean hands, and instead makes a one-sentence claim, with no argument or evidence, that Charter

"failed to cite any evidence" for this defense. D.I. 461 at 18. However, as the movant, Sprint "bears

the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp.*

*v. Catrett*, 477 U.S. 317, 322 (1986). Sprint's unexplained argument for unclean hands does not

satisfy that standard, and thus Sprint's motion fails from the outset. *Id; see also Ashe v. Corley*,

992 F.2d 540, 543 (5th Cir. 1993) ("It is not enough for the moving party to merely make a

conclusory statement that the other party has no evidence to prove his case.").

Even if the Court considers the merits of Sprint's motion, it should be denied. As explained

above, there is a genuine factual dispute as to whether Sprint obtained the Asserted Patents through

misrepresentations to the USPTO (it did). *See* Section IV. Sprint's "affirmative acts of misconduct

intended to deceive [] the PTO" not only support Charter's inequitable conduct defense, they also

support Charter's unclean hands defense, and create material factual disputes issue for this defense

as well. *Therasense*, 649 F.3d at 1287; *Cheng*, 2012 WL 12953831, at *4.

## VI.    *DAUBERT* STANDARD

"[T]he question of whether the expert is credible or the opinion is correct is generally a

question for the fact finder, not the court." *Summit 6, LLC v. Samsung Elecs. Co., Ltd.*, 802 F.3d

1283, 1296 (Fed. Cir. 2015); *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596 (1993).

"[W]here the methodology is reasonable and its data or evidence are sufficiently tied to the facts of the case, the gatekeeping role of the court is satisfied, and the inquiry on the correctness of the methodology and of the results produced thereunder belongs to the factfinder." *Summit 6*, 802 F.3d at 1296. "As long as an expert's scientific testimony rests upon good grounds, based on what is known, it should be tested by the adversarial process—competing expert testimony and active cross-examination—rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies." *Intellectual Ventures I LLC v. Check Point Software Techs. Ltd.*, 215 F. Supp. 3d 314, 328 (D. Del. 2014).

## VII.   MS. MULHERN'S APPORTIONMENT ANALYSIS IS BASED ON SOUND METHODOLOGY AND TIED TO THE FACTS OF THIS CASE

Sprint seeks to exclude testimony from Charter's damages expert (Ms. Mulhern) regarding her "IP Share Approach" to apportioning damages. Sprint's attack rests on characterizing her analysis as a "top-down" approach. This incorrect; Ms. Mulhern's IP Share Approach is an apportionment analysis used to isolate the value of the Asserted Patents from the value of VoIP technology generally that Sprint's expert Dr. Mangum calculated—it is not a cap on damages (i.e., not a top-down approach). Moreover, it is only one of Ms. Mulhern's several apportionment analyses. Her other apportionment factors, which Sprint does not challenge, reveal that the IP Share Approach is conservative and excluding it would result in a lower damages number. Similarly, Sprint's arguments regarding the technical underpinnings of the analysis go to its weight, not its admissibility *Daubert*, and a full examination of what Ms. Mulhern did reveals that her analysis is methodologically sound. As the Federal Circuit has recognized, estimating damages "is not an exact science," and Sprint's motion should be denied. *Summit 6,* 802 F.3d at 1296.

### A.     Factual Background

Charter's damages expert, Ms. Mulhern, analyzed Sprint's alleged damages in her rebuttal report and employed multiple accepted economic approaches to isolate the footprint of the

Asserted Patents. As part of this analysis, she critiqued Dr. Mangum's opinions for failing to apportion down to the footprint of the Asserted Patents. (*See, e.g.*, Ex. 71 (Mulhern Reb. Rpt.), ¶¶ 8, 177–78, 371). As explained in Charter's *Daubert* motion (D.I. 468), Dr. Mangum's lost profits opinion is based on the profits Sprint (allegedly) would have earned from Charter as a customer of Sprint's wholesale VoIP service (Ex. 71 (Mangum Rpt.) at Mangum Ex. 1); his analytical approach purports to calculate the additional anticipated profits a cable company would earn for VoIP services versus traditional circuit switched services (*id.*, ¶¶ 186–200); and his *Georgia-Pacific* royalty is based on settlement agreements and verdicts involving patents beyond the ones asserted in this case. (*Id.*, ¶¶ 94–147.) Many of the settlement agreements on which Dr. Mangum relies license Sprint's entire voice-over-packet ("VoP") patent portfolio, which contains over 100 U.S. patents. (Ex. 71 (Mulhern Reb. Rpt.) at Mulhern Ex. 27).

Ms. Mulhern's assessment of the value of the Asserted Patents relative to Sprint's VoP portfolio of over 100 patents factors into her apportionment of Sprint's licenses. Her assessment of the value of the Asserted Patents relative to VoIP technology overall factors into her apportionment of Dr. Mangum's lost profits and "analytical approach" numbers. And, while Sprint challenges Ms. Mulhern's IP Share Approach, it does not challenge Ms. Mulhern's apportionment based on the use of the allegedly infringing methods or based on the value of the equipment involved in the alleged infringement. (Ex. 71 (Mulhern Reb. Rpt.), ¶¶ 194–200, 221–23).

### 1.   Ms. Mulhern's Apportionment of Sprint's VoP Patent Portfolio Licenses

To isolate the value of the Asserted Patents within Sprint's portfolio licenses and settlement agreements, Ms. Mulhern uses three primary approaches based on (1) patent forward citations (which Sprint does not challenge), (2) numeric proportionality, and (3) skewed distribution. (Ex. 71 (Mulhern Reb. Rpt.), ¶¶ 201–12).

Ms. Mulhern's unchallenged forward citation approach is based on the well-accepted proposition "that more-valuable patents tend to receive more forward citations than less valuable patents, keeping other things equal," and thus "the relative value of patents can be estimated on their forward citation counts, with appropriate controls for the age of the patent and the field of technology." *(*Ex. 71 (Mulhern Reb. Rpt.), Appx. A at A-1; *see also id.*, ¶ 206). As part of this analysis, Ms. Mulhern obtained data for the approximately 135,000 U.S. patents issued under the 14 Cooperative Patent Classification ("CPC") groups corresponding to the primary invention codes of the 135 patents in Sprint's VoP portfolio. (*Id.* at Appx. A at A-2, Mulhern Ex. A-2). Then, for each of the patents in Sprint's VoP portfolio, Ms. Mulhern compared patents of similar vintage in the same CPC groups to determine whether Sprint's VoP patents had more or fewer forward citations than the comparison patents. The result was a value she called the "adjusted forward citation count." (*Id.* at Appx. A at A-3, A-4). Every one of the Asserted Patents received an "adjusted forward citation count" of less than 1, indicating that each "receives fewer citations than … would be expected from a patent of similar age in the same technology field." (*Id.* at Appx. A at A-4, Mulhern Ex. A-1). Using the adjusted forward citation counts, Ms. Mulhern ranked the patents in Sprint's VoP portfolio and determined the Asserted Patents "are less valuable on average than the other patents in the Sprint VoP portfolio." (*Id.* at ¶¶ 208, 211, Appx. A at A-4, Mulhern Ex. A-3).

Ms. Mulhern undertook two additional analyses to determine the value of the Asserted Patents relative to Sprint's VoP portfolio. First, she used a numeric proportionality approach, which assumes, despite the fact that the Asserted Patents are less valuable on average than other patents in Sprint's VoP portfolio, that each patent within that portfolio is entitled to a pro rata share of the value. (Ex. 71 (Mulhern Reb. Rpt.), ¶ 202). Second, Ms. Mulhern applied a skewed

distribution approach, in which she allowed for the possibility that "the majority of patents [within a portfolio] ha[s] little to no value and only a select few hav[e] any substantial value." (*Id.* at ¶ 203). To support her skewed distribution approach, Ms. Mulhern relied on economic literature, including a 1998 research study by Prof. Mark Schankerman, who conducted an analysis of patent renewal data across different technology fields and nationalities of ownership. Prof. Schankerman found that the top 1% of electronic patents accounted for 24% of the total value among all patents in that field, and that the top 5% and top 10% accounted for 55% and 84% of the total value, respectively. (*Id.* at ¶ 203; Ex. 74 (Schankerman), at 78, 94). Numerous academic journals have corroborated and positively cited Prof. Schankerman's work. (*See* Ex. 71 (Mulhern Reb. Rpt.), ¶ 203 & n.542).[21]

Contrary to Sprint's assertion, Ms. Mulhern's skewed distribution approach does not put a cap on royalties (i.e., it is not a top-down approach). The distribution does not directly place a value on any patent; rather, it estimates the *share* of value attributable to that patent based on where it falls within the distribution. To be conservative, Ms. Mulhern assumed that the Asserted Patents are amongst the most valuable within Sprint's VoP portfolio (i.e., within the top 10%), thus crediting the Asserted Patents with between 71.1% and 84.0% of the total value of Sprint's licensed VoP portfolio. (*Id.* at ¶ 205, Mulhern Exs. 27–28). Ultimately, Ms. Mulhern applies these skewed

---

[21]  *See, e.g.¸* Ex. 73 at 13, 15, Fig. 1 (surveying other studies and finding that the top 10% of patents account for approximately 60 to 85% of total value, based on scale parameters of the reported value distributions); Ex. 75 at 327–28, Table 1 (reviewing 70,000 U.S. patents and finding that the top 10% of patents account for approximately 81% of total value); Ex. 76 at 777, 779–80 (reviewing French, U.K., and German patents and finding that the top 10% of patents account for approximately 47 to 69% of total value); Ex. 77 at 773–774, Table 4 (reviewing electronic patents in the EU and finding that the top 10% of electronics patents account for approximately 86% of total value, with results consistent across countries); Ex. 79 at Table 1 (reviewing U.S.-owned German patents and finding that the top 10% of patents account for approximately 81 to 85% of total value).

distribution apportionment factors to Sprint's portfolio licenses, rather than the much lower 8% apportionment factor from her numeric proportionality approach, which her (unchallenged) forward citation analysis suggests is conservative. (*Id.* at Mulhern Ex. 28, ¶¶ 210–211).

### 2.     Ms. Mulhern's Analysis Accounts for Other Contributions to VoIP

Numerous technologies contribute to the value of VoIP networks, and the value of these technologies should be accounted for in an apportionment analysis. For example, technologies covered by more than two dozen technology standards are used to provision VoIP calls, and the USPTO has granted many other patents relating to VoIP. (Ex. 71 (Mulhern Reb. Rpt.), ¶ 217; *see also* Ex. 78 (Almeroth Reb. Rpt.), ¶¶ 238–370, Almeroth Ex. Standards). As Sprint's inventors admit, Sprint did not invent all of the technology that is necessary for provisioning VoIP services.[22] Moreover, Charter's VoIP infrastructure includes equipment beyond that used for the IP-PSTN connectivity (allegedly) covered by the Asserted Patents. (Ex. 71 (Mulhern Reb. Rpt.), ¶¶ 78–79, 82–83; Ex. 78 (Almeroth Reb. Rpt.), ¶¶ 772–82). Likewise, Sprint's VoIP wholesale service implicates technology beyond the Asserted Patents, including connecting non-infringing VoIP-to-VoIP calls. (*See* Ex. 80 (Pedigo Rpt.) ¶¶ 29–33; Ex. 71 (Mulhern Reb. Rpt.), ¶ 200; Ex. 24at 175:3–13; *see also* Ex. 81 at 644:22–645:25). Nonetheless, Sprint's expert, as part of his lost profits and "analytical approach" opinions, credits the entire value of VoIP services to the Asserted Patents. (*See* Ex. 81 102:2–15, 229:24–230:21, 449:2–7; Ex. 27 (Mangum Rpt.), ¶¶ 90–91, 199–200). As part of Ms. Mulhern's critique, she applied several apportionment approaches to isolate the economic footprint of the Asserted Patents.

First, Ms. Mulhern used an equipment share approach, which evaluates the share of

---

[22] *See, e.g.*, Ex. 35 (M. Gardner Dep. Tr.) at at 103:5–12 (admitting Sprint did not invent the IP media gateway), 103:1–18 (admitting Sprint did not invent the IP soft switch); Ex. 38 (A. DuRee Dep. Tr.) at 225:13–15, 225:9–12 (admitting Sprint did not invent VoIP or VoATM).

equipment costs associated with the key equipment involved in the alleged infringement, to determine that the Asserted Patents represent approximately 18% of the value of VoIP. (Ex. 71 (Mulhern Reb. Rpt.), ¶¶ 221–24.) Sprint does not challenge this apportionment approach.

Second, Ms. Mulhern applied similar numeric proportionality and skewed distribution approaches as described above. (*Id*. at ¶¶ 219–22). A key difference, however, is that here Ms. Mulhern took into account the fact that VoIP phone service includes far more technology than what is contained in Sprint's 135-patent VoP portfolio. As a first step, she identified "all USPTO CPC subclasses and sub-subclasses that mention 'VoIP' or 'voice over Internet Protocol' in their titles or descriptions." (*Id*. at ¶ 218 & n.567, Mulhern Ex. 29). Charter's technical expert, Dr. Almeroth, then selected the four largest of these CPC code groups and determined a statistically significant sample size for each (a total of 350 patents). (Ex. 78 (Almeroth Reb. Rpt.), ¶¶ 870–72). Dr. Almeroth then randomly selected patents from each of those four groups and analyzed their titles, abstracts, and first independent claim, using his technical expertise, to determine whether each was relevant to the provisioning of VoIP services. (*Id*. at ¶¶ 873–84; Ex. 82 at 431:16–25). He found that at least 52% of the patents in the four CPC groups were relevant. (Ex. 71 (Mulhern Reb. Rpt.), ¶ 218 & n.569, Mulhern Ex. 31; *see also* Ex. 78 (Almeroth Reb. Rpt.), ¶ 874).

Ms. Mulhern then applied Dr. Almeroth's findings to the approximately 4,200 active unique patents in the set, which "result[ed] in an estimate of approximately 2,200 active patents relevant to the provision of VoIP services as of May 2014." (Ex. 71 (Mulhern Reb. Rpt.), ¶ 218). As Dr. Almeroth and Ms. Mulhern explained, this is an extremely conservative number because it includes only patents within the four largest CPC groups relating to VoIP that Dr. Almeroth determined to be relevant to the provision of VoIP services. (Ex. 83 at 148:14–149:4, 149:11–21; Ex. 82 at 430:24–431:15; *see also* Ex. 71 (Mulhern Reb. Rpt.), Mulhern Ex. 29).

Ms. Mulhern then analyzed the Asserted Patents' contribution to VoIP in light of the at least 2,200 other patents related to VoIP. Under a numeric proportionality approach, Ms. Mulhern found that the Asserted Patents account for 0.5% of the total value of VoIP services. (Ex. 71 (Mulhern Reb. Rpt.), ¶ 219). Ms. Mulhern's patent forward citation analysis, which demonstrates that the Asserted Patents have fewer citations than average, confirms the conservative nature of this approach. *See supra*, Section VII.A.1. Ms. Mulhern also used a skewed-distribution approach, crediting Sprint's Asserted Patents as being within the ***top 1%*** of all patents relating to the provisioning of VoIP. (Ex. 71 (Mulhern Reb. Rpt.), ¶ 220). Her analysis results in the Asserted Patents receiving 12% of the total value. (*Id.* at Mulhern Ex. 32). Ms. Mulhern used the more conservative 12% apportionment factor to adjust Dr. Mangum's lost profits and analytical approach opinions. (*Id*. at ¶¶ 178, 305, Mulhern Exs. 23–25, 46–47; Ex. 83 at 136:19–137:6). Ms. Mulhern's unchallenged equipment share approach results in an 18% apportionment factor, which is consistent with her IP Share analysis. (*See* Ex 71 (Mulhern Reb. Rpt.), ¶ 224).

### B.    Argument

#### 1.    Ms. Mulhern's Apportionment Analysis Is Sound

##### a.    The IP Share Approach is an Apportionment Analysis, Not a Top-Down Analysis

Sprint mischaracterizes Ms. Mulhern's apportionment analysis as a "top-down approach," akin to that in *TC Tech. LLC v. Sprint Corp.* D.I. 458 at 1, 6–7. A "top-down" approach begins with determining a cap on royalties for standard-essential patents throughout an industry, and then works backwards to determine the portion of that capped royalty attributable to the asserted patent. *See TC Tech. LLC v. Sprint Corp.*, No. 16-cv-153-RGA, 2019 WL 2515779, at *15 (D. Del. June 18, 2019) (noting that Sprint's expert "relies on a 'top-down' approach, which determines a reasonable royalty ***based on an aggregate royalty for the end-products*** associated with a standard" (emphasis added)). The analysis in this case differs.

Here, Dr. Mangum identified measures of the alleged value of the Asserted Patents: (1) the wholesale VoIP profits Sprint (allegedly) would have earned from Charter; (2) the entire cost savings of VoIP over existing circuit-switch telephony; and (3) licenses to Sprint's entire VoP portfolio. Ms. Mulhern starts with these values and, using her various apportionment analyses, isolates the economic footprint of the Asserted Patents from Sprint's unasserted VoP patents and from VoIP technology overall. *See supra*, Section VII.A. None of these analyses starts with an "aggregate royalty for the end-products associated with a standard." *Id*. at *15. Far from being improper, this analysis is required. *See, e.g.*, *Mentor Graphics Corp. v. EVE-USA, Inc.*, 851 F.3d 1275, 1287 (Fed. Cir. 2017) ("[A]pportionment is an important component of damages law generally, and we believe it is necessary in both reasonable royalty and lost profits analysis."); *Ferguson Beauregard/Logic Controls, Div. of Dover Res., Inc. v. Mega Sys., LLC*, 350 F.3d 1327, 1346 (Fed. Cir. 2003) (vacating damages award where "the district court based its lost profits award on evidence of sales of a device embodying features in addition to those present in the infringed" patent and "therefore failed to distinguish the allocation of profits that would have been made 'but for' the infringement"); *Trell v. Marlee Elecs. Corp.*, 912 F.2d 1443, 1447 (Fed. Cir. 1990) (holding that "[t]he district court's apparent failure to consider the fact that the Bewator license … encompassed the right to other inventions compels reversal" of royalty damages award).

In contrast, Sprint's expert in *TC Tech*. began by opining that "a reasonable aggregate royalty 'for the industry-wide set of LTE patents,' including the [asserted patent], is between 6 and 10 percent," then opined that the asserted patent was worth a small percentage of Sprint's LTE revenues based on the overall cap. *TC Tech*, 2019 WL 2515779, at *15. Sprint's starting royalty (6% to 10%) came from non-party companies that had committed to license their patents at FRAND rates as part of a standards process, which this Court correctly found was not tied to the

37

facts of that case. *Id*. at *15–17. For example, the royalty rate Sprint used had nothing to do with the asserted patent because that patent "was never accepted into the ETSI standard." *Id*. at *16. As explained above, Ms. Mulhern did not use a royalty cap; she started with values that Dr. Mangum characterized as encompassing the value of the Asserted Patents. *See supra*, Section VII.A.

> b. **The Numeric Proportionality Approach Is Tied to the Facts of this Case**

Sprint's claim that Ms. Mulhern's use of numeric proportionality "is built solely on her unexamined assumption that every patent in every set … is the same as every other patent in those sets" is baseless. D.I. 458 at 8 (emphasis in original). Ms. Mulhern conducted an unchallenged forward citation analysis, and found that every Asserted Patent "receive[d] fewer citations than … would be expected from a patent of similar age in the same technology field" based on the comparison sets described above. (Ex 71 (Mulhern Reb. Rpt.) at Appx. A, A-4, Mulhern Ex. A-1; *see also id*., ¶ 206). That analysis shows the Asserted Patents "are *less valuable on average* than the other patents in the Sprint VoP portfolio." (Ex. 71 (Mulhern Reb. Rpt.), ¶¶ 208, 211) (emphasis added). Thus, Ms. Mulhern's use of numeric proportionality is conservative, as shown by her other unchallenged analyses.[23] Ms. Mulhern also took the even more conservative step of crediting Sprint's patents as being in the top 1% of all VoIP-related patents and the top 10% of Sprint's VoP portfolio. (*Id*., ¶¶ 204, 220, Mulhern Exs. 28 & 32). This skewed distribution is what Ms. Mulhern used to calculate her ultimate apportionment factor. (*See* Ex. 83 at 153:13–22).

Sprint cites *ResQNet.com, Inc. v. Lansa, Inc.* and *Lucent Techs., Inc. v. Gateway, Inc.*, to suggest that Ms. Mulhern's apportionment analyses are not sufficiently tied to the facts of this case. In those cases, the Federal Circuit rejected the use of licenses to derive a royalty rate because

---

[23] These key differences make Sprint's citation to *In re Innovatio IP Ventures, LLC Patent Litig*, inapposite. No. 11 C 9308, 2013 WL 5593609, at *10 (N.D. Ill. Oct. 3, 2013).

those licenses had "no relationship to the claimed invention," showed no "discernable link to the claimed technology," and were "radically different from the hypothetical agreement." 594 F.3d 860, 869–70 (Fed. Cir. 2010); 580 F.3d 1301, 1327 (Fed. Cir. 2009). By contrast, Ms. Mulhern analyzes Sprint's portfolio licenses, which include the Asserted Patents, and further accounts for the relative contribution of the Asserted Patents compared to the other 100-plus patents in Sprint's VoP portfolio. (Ex. 71 (Mulhern Reb. Rpt.), ¶ 202). For her other numeric proportionality analyses, Ms. Mulhern relies on Dr. Almeroth's identification of patents related to the provisioning of VoIP as her input, as discussed in more detail in Section VII.B.1.d. (*Id.*, ¶ 217–19). Sprint's infringement accusations and damages theories all relate to VoIP phone service, confirming that Ms. Mulhern's apportionment inputs are tied directly to the accused technology.

### c.     **The Skewed-Distribution Approach Is Tied This Case's Facts**

Sprint does not challenge the methodology behind Ms. Mulhern's skewed distribution approach. This is unsurprising because that approach has been accepted repeatedly.[24] *See, e.g.*, *In re Innovatio IP Ventures, LLC Patent Litig.*, No. 11 C 9038, 2013 WL 5593609 (N.D. Ill. Oct. 3, 2013); *Odyssey Wireless, Inc. v. Apple Inc.*, No. 15-cv-01735-H-RBB, 2016 WL 7644790 (S.D. Cal. Sept. 14, 2016). Indeed, the Court in *LG Display Co. v. AU Optronics Corp.* (not a standard essential patent case) adopted a damages opinion based on a skewed-distribution approach. 722 F. Supp. 2d 466, 473–74 (D. Del. 2010); *see also LG Display Co. v. AU Optronics Corp.*, Case No. 1:06-cv-00726-LPS, D.I. 1601 (D. Del. Sept. 15, 2010), ¶¶ 17–18 & n.4 (explaining the expert used a value distribution based on Prof. Schankerman's research). The skewed-distribution

---

[24] Sprint's expert complains that these cases involved standard essential patents. But Schankerman focused on data for patents generally, not standard essential patents (*see* Ex. 74 (Schankerman) at 80), and thus is just as applicable outside the standard-essential context.

approach also has been confirmed and positively cited in the economics literature.[25] (Ex. 71 (Mulhern Reb. Rpt.), ¶ 203 & n.542). At bottom, Sprint fails to cite a single case excluding the use of a skewed-distribution approach.

Instead, Sprint complains that "Ms. Mulhern [m]isapplies Dr. Schankerman's [m]ethodology." D.I. 458 at 8. Sprint is incorrect. Sprint argues that that Prof. Schankerman's "electronics" grouping is not specific enough to apply to "VoIP" and that the age and location of his data set undermines its applicability. *Id.* at 10-11. But as Ms. Mulhern explained and the economic literature shows, the skewed distribution of value has been confirmed and used many times, including in this District. *See supra*, Section VII.A.1; *LG Display*, 722 F. Supp. 2d at 473–74. Ms. Mulhern's use of Prof. Schankerman's research is certainly the "kinds of facts or data" experts in the economics field would use "in forming an opinion on the subject." Fed. R. Evid. 703. And even if the data were "imperfect, and more (or different) data might have resulted in a 'better' or more 'accurate' estimate in the absolute sense, it is not the district court's role under *Daubert* to evaluate the correctness of facts underlying an expert's testimony." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 856 (Fed. Cir. 2010), *aff'd*, 564 U.S. 91 (2011). Sprint's disagreement with Ms. Mulhern's interpretation does not warrant exclusion.[26] *Id.*; *Intel Corp. v. Future Link Sys., LLC*, C.A. No. 14- 377-LPS, 2017 WL 2482881, at *5 (D. Del. June 1, 2017)

---

[25] *See supra* note 21.

[26] Sprint cites *TCL*, but that case is inapposite. First, it is not a *Daubert* decision; it contains findings of fact and conclusions of law from a bench trial. 2018 WL 4488286, at *1–2. If anything, *TCL* shows that such opinions should be heard by the fact finder. Second, the expert there used a different academic paper, with a different distribution. Based on that record, the court was "not persuaded" the findings were "applicable to telecommunications SEPs [standard essential patents]." *Id.* at *23. Third, *TCL* was reversed in part, as the Federal Circuit determined the patentee was entitled to a jury trial on damages, rendering the lower court's factual findings on value distribution irrelevant. *See TCL Commc'n Tech.Holdings Ltd. v. Telefonaktiebolaget LM Ericsson,* 943 F.3d 1360, 1375–76 (Fed. Cir. 2019).

(finding challenges to apportionment "go to the weight of [the] testimony, not its admissibility").

Sprint's complaints about the distribution of value amongst the top 1% are also meritless. First, as explained in Section VII.B.1, the skewed distribution approach is not a "cap" on value. The approach merely describes how value is distributed; it does not define the value in and of itself. Second, the parties hotly dispute Sprint's position that the Asserted Patents "solve[d] a fundamental problem that made an entire technology possible" (D.I. 458 at 11), and are entitled to a large share of the value of the top 1% of patents relevant to the provisioning of VoIP.[27] *Daubert* is not meant to resolve such factual disputes that go to the merits of the underlying issue. Third, as explained in Section VII.A.1, Ms. Mulhern's unchallenged forward citation analysis shows the Asserted Patents "are less valuable on average," confirming that her skewed distribution approach is conservative. (Ex 71 (Mulhern Reb. Rpt.), ¶¶ 206, 208, 212, Appx. A-4, Mulhern Ex. A-1).

    d.    **The CPC Analysis Is Reliable and Tied to the Facts of this Case**

Although Ms. Mulhern explained in her report and deposition that she left the technical analysis to Dr. Almeroth (Ex. 71 (Mulhern Reb. Rpt.), ¶ 218; *see also* Ex. 83 at 146:13–147:19), Sprint insists on characterizing Ms. Mulhern's identification of CPC codes as a "technical opinion" requiring technical qualifications. D.I. 458 at 12. Not so. One need not be a technical expert to navigate to the USPTO website (as Ms. Mulhern did) and use the search functions to identify "all USPTO CPC subclasses and sub-subclasses that mention 'VoIP' or 'voice over Internet Protocol' in their titles or descriptions." (Ex. 71 (Mulhern Reb. Rpt.), ¶ 218 & n. 567, Mulhern Ex. 29). Further, Ms. Mulhern's statement that the 22 resulting CPC codes "relate to VoIP" is neither a technical opinion nor a conclusion of relevance; it is an observation based on the titles and

---

[27] Sprint's complaint is ironic given that its expert failed to apportion at all, crediting the Asserted Patents with 100% of the value associated with settlements that included 100+ patents, all cost savings for VoIP, and a basket of wholesale VoIP services.

descriptions that the USPTO provided as part of its patent classification system.

Critically, Ms. Mulhern asked Dr. Almeroth to analyze the CPC codes and their underlying patents to determine whether they were relevant to VoIP. (Ex. 78 (Almeroth Reb. Rpt.), ¶ 867; Ex. 71 (Mulhern Reb. Rpt.), ¶ 218; Ex. 83 at 146:19–147:5; Ex. 82 at 430:20–431:5). Thus, it was Dr. Almeroth who did all of the relevant technical analysis and provided all of the technical opinions. (*E.g.*, Ex. 78 (Almeroth Reb. Rpt.), ¶¶ 867–74; Ex. 82 at 430:20–431:5). Of course, it is entirely proper for a damages expert to rely on technical opinions and analyses from technical experts. *See, e.g.*, *W.L. Gore & Assocs., Inc. v. C.R. Bard, Inc.*, No. 11-515-LPS-CJB, 2015 WL 12731924, at *6 (D. Del. Nov. 4, 2015) ("[D]amages experts routinely rely on facts and opinions provided by technical experts when rendering their damages analysis.") (collecting cases). Because Ms. Mulhern based her IP Share Approach on patents that Dr. Almeroth determined to be relevant to the provision of VoIP services, her apportionment analysis is tied to the facts of this case.

With respect to the substance of Dr. Almeroth's technical analysis, Sprint fails to identify any methodological flaw. Dr. Almeroth examined the 22 CPC subclasses and sub-subclasses that the USPTO specifically identified as relating to VoIP, selected the four containing the largest number of patents, and reviewed a statistically significant sample from each group to determine the number of patents relevant to offering VoIP services. (Ex. 78 (Almeroth Reb. Rpt.), ¶¶ 867–74). The fact that the Asserted Patents are not included in the four groups Dr. Almeroth reviewed is a red herring and only further demonstrates that the CPC code analysis (and Ms. Mulhern's resulting apportionment factor) is conservative.[28] If all telecommunications-related CPC

---

[28] Sprint points out that one of the CPC groups Dr. Almeroth reviewed relates to billing-related technology for VoIP, implying that it is unrelated to the "fundamental technology disclosed in Sprint's patents." D.I. 458 at 14. This is incorrect: three of Sprint's VoP patents (U.S. Pat. Nos. 6,262,992; 6,904,060; and 7,545,824) have that CPC code (H04M 15/00) as their "Primary CPC Group." (Ex. 71 (Mulhern Reb. Rpt.) at Mulhern Ex. A-1.)

subclasses or sub-subclasses were included, then the total number of VoIP-related patents could only increase, thereby decreasing Ms. Mulhern's apportionment factor and damages numbers.

Finally, Sprint's characterization of Dr. Almeroth's analysis as just his "say-so" is wrong. D.I. 458 at 14. Dr. Almeroth discussed his relevance analysis in his report and deposition. Specifically, he reviewed the title, abstract, filing date, and first independent claim for each of the 350 randomly selected patents, and "looked at what the claims described from a person of ordinary skill in the art" to determine whether the patent disclosed technology "relevant to provisioning of claimed services." (Ex. 82 at 432:4–7, 433:5–21; Ex. 78 (Almeroth Reb. Rpt.) ¶ 874). He explained the "kinds of things [he] would determine to be relevant," such as "technology related to error concealment or some aspect of signaling" or "descriptions of other functionality related to what would be necessary for voiceover IP." (Ex. 82 at 434:2–14, 434:25–435:15). He also considered "the degree to which [these technologies] were described" and "what [the patents] were actually describing" to determine their relevance. (*Id.* at 434:2–14). Sprint's claim that Dr. Almeroth provided no "explanation whatsoever of his methodology for determining" relevancy (D.I. 458 at 14) is wrong. Sprint's complaint that Dr. Almeroth should have done more, such as analyzing the patents' specifications or file histories (*id.* at 14), should be addressed by cross-examination, not exclusion. *Daubert*, 509 U.S. at 596; *Intellectual Ventures I*, 215 F. Supp. 3d at 328.

## VIII.   DR. ALMEROTH'S SEPARATE PATENTABILITY OPINIONS ARE PROPER

Sprint seeks to exclude testimony from Dr. Almeroth regarding separate patentability. Sprint's arguments, however, largely ignore Dr. Almeroth's detailed 80-plus page analyses demonstrating that the alleged equivalents Sprint accuses of infringement were separately patented. (Ex. 78 (Almeroth Reb. Rpt.), ¶¶ 238–370). This "fact of separate patentability is relevant, and is entitled to due weight." *Nat'l Presto Indus., Inc. v. W. Bend Co.*, 76 F.3d 1185, 1192 (Fed. Cir. 1996); *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co. Ltd.*, 493 F.3d 1368,

1379–80 (Fed. Cir. 2007) ("[W]hen a device that incorporates the purported equivalent is in fact the subject of a separate patent, a finding of equivalency … is at least considerably more difficult to make out."); *St. Jude Med. Cardiology Div., Inc. v. Volcano Corp.*, 1-10-cv-00631, D.I. 395, Slip Op. at 2 (D. Del. Oct. 9, 2012) (Andrews, J.) (denying motion in limine because "separate patentability is relevant to infringement analysis under the doctrine of equivalents"). As Sprint's motion is nothing but a disagreement with Dr. Almeroth's opinion, its motion should be denied.

### A.   Dr. Almeroth Demonstrated that the Accused Media Gateways Embody the Later-Issued Patents

Sprint asserts that "fatally absent from Dr. Almeroth's analysis" is a demonstration that accused devices practice the separate patents. D.I. 458 at 15. That assertion is incorrect: Dr. Almeroth's report provides extensive evidence of practice, including limitation-by-limitation mappings to the accused products. (*E.g.*, Ex. 78 (Almeroth Reb. Rpt.), at ¶¶ 259–67, 306–15, 335–36, 340–41, 348–49). Sprint's expert does not dispute practice of any of the separate patents. (Ex. 85 at 258:18–267:5). Notably, Sprint *cannot* dispute its DoE theories encompass these separate patents, because its theories admittedly cover "*every way*" to do packet-based interworking. (*Id.* at 1271:8–1273:14). The fact that Sprint's DoE theories capture separately patentable inventions is highly relevant to a DoE analysis, and under Federal Circuit law the jury is entitled to hear that evidence. *Nat'l Presto*, 76 F.3d at 1192; *Festo*, 493 F.3d at 1379–80; *St. Jude*, Slip Op. at 2.

Given the evidence of the accused devices' practice, Sprint pivots to arguing that Dr. Almeroth has not shown practice by Cisco devices. D.I. 458 at 15. But Cisco devices are not at issue. The accused devices are built by Cisco licensees, not Cisco itself. (Ex. 78 (Almeroth Reb. Rpt.), at ¶¶ 363–70). Contrary to Sprint's suggestion, the fact that the alleged equivalent is manufactured by a licensee does not negate the relevance of separate patentability. *E.g.*, *Siemens Med. Sols. USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc.*, No. 07-cv-190, 2008 WL 114361,

at *1, *4–5 (D. Del. Jan. 8, 2008) (separate patentability relevant where alleged equivalent was manufactured under license).

### B. USPTO Consideration Goes to Weight not Admissibility

Sprint complains that Dr. Almeroth failed to show that the USPTO considered the Asserted Patents during prosecution of the later-issued third-party patents. D.I. 458 at 16. But Federal Circuit law imposes no such legal requirement. *See Festo*, 493 F.3d at 1379–80. To the contrary, numerous courts have allowed evidence of separate patentability where the patent-in-suit was not specifically cited during prosecution. *See St. Jude*, Slip Op. at 2 (finding separate patentability relevant though a patent-in-suit was not cited during prosecution, Ex. 84 at 319); *Arlaine & Gina Rockey, Inc. v. Cordis Corp.*, No. 02-22555-CIV, 2004 WL 5504978, at *19 (S.D. Fla. Jan. 5, 2004) (same, Ex. 86 (U.S. Patent No. 4,733,665) at 1 (later-issued patent not listing asserted patents in References Cited)); *Engineered Prods. Co. v. Donaldson Co.*, 313 F. Supp. 2d 951, 1008 (N.D. Iowa 2004) (prosecution history evidence "goes to the weight, not the admissibility" of separate patentability) (citing *Nat'l Presto*, 76 F.3d at 1191-92); *WARF v. Apple, Inc.*, 14-cv-062-wmc, 2015 WL 13546429, at *1–2 (W.D. Wis. Oct. 4, 2015).[29] Regardless, Dr. Almeroth demonstrated that the USPTO did in fact consider the specifications of Sprint's Asserted Patents during the prosecution of several of the separate patents. (*E.g.*, Ex. 78 (Almeroth Reb. Rpt.), at ¶¶ 297–304, 333, 337–38, 346; Ex. 87 (U.S. Patent No. 5,703,876) at Certificate of Correction (continuation-in-part of Call Control and Broadband specifications)).

---

[29] The Federal Circuit cases Sprint cites (*Hoganas*, *Zygo*, and *Nat'l Presto*) do not hold USPTO consideration is a requirement for separate patentability to be relevant.  Sprint cites a district court case, *Hochstein*, but that case was decided under FRE 403, not *Daubert*. *Hochstein v. Microsoft Corp.*, No. 04-73071, 2009 WL 2022815, at *2 (E.D. Mich. July 7, 2009). To the extent Sprint reads it more broadly, the case is inconsistent with the weight of precedent and should be disregarded. *Id.* (recognizing disagreement with other cases); *St. Jude*, Slip Op. at 2.

OF COUNSEL:

David S. Benyacar
Daniel L. Reisner
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019
(212) 836-8000
david.benyacar@arnoldporter.com
daniel.reisner@arnoldporter.com

Gregory Arovas
Ryan Kane
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800
garovas@kirkland.com
ryan.kane@kirkland.com

Luke L. Dauchot
Kirkland & Ellis LLP
333 South Hope Street
Los Angeles, CA 90071
(213) 680-8400
ldauchot@kirkland.com

*/s/ Kelly E. Farnan*
Kelly E. Farnan (#4395)
Richards, Layton & Finger, P.A.
920 N. King Street
One Rodney Square
Wilmington, DE 19801
(302) 651-7700
Farnan@rlf.com

*Attorneys for Defendants Charter*
*Communications, Inc., Spectrum*
*Management Holding Company, LLC,*
*Charter Communications Holdings, LLC,*
*Charter Communications Operating LLC*
*and Bright House Networks, LLC*

*/s/ Andrew C. Mayo*
Steven J. Balick (#2114)
Andrew C. Mayo (#5207)
Ashby & Geddes
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
sbalick@ashbygeddes.com
amayo@ashbygeddes.com

OF COUNSEL:
Robinson Vu
Natalie Alfaro Gonzales
Lindsay Volpenhein Cutié
Amy E. Bergeron
BAKER BOTTS L.L.P.
One Shell Plaza
910 Louisiana Street
Houston, TX 77002-4995
(713) 229-1234

*Attorneys for Defendants Mediacom*
*Communications Corp., WideOpenWest et*
*al., Atlantic Broadband Finance, LLC et*
*al., Grande Communications Networks,*
*L.L.C. et al.*
(For Section IV only)

46

Timothy S. Durst
BAKER BOTTS L.L.P.
2001 Ross Avenue
Suite 900
Dallas, Texas 75201-2980
(214) 953-6500


DATED: June 30, 2020

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 30, 2020, true and correct copies of the foregoing document

were caused to be served on the following counsel of record as indicated:

**BY ELECTRONIC MAIL**
Stephen J. Kraftschik
Christina B. Vavala
Polsinelli PC
222 Delaware Avenue, Suite 1101
Wilmington, DE 19801

**BY ELECTRONIC MAIL**
Robert H. Reckers
Michael W. Gray
Jonathan M. Hernandez
Shook, Hardy & Bacon LLP
JPMorgan Chase Tower
600 Travis Street, Suite 3400
Houston, TX 77002

**BY ELECTRONIC MAIL**
B. Trent Webb
Ryan J. Schletzbaum
Ryan D. Dykal
John D. Garretson
Jordan T. Bergsten
Aaron E. Hankel
Lauren E. Douville
Mark D. Schafer
Maxwell C. McGraw
Samuel J. LaRoque
Thomas M. Patton
Lydia C. Raw
Shook, Hardy & Bacon LLP
2555 Grand Boulevard
Kansas City, MO 64108

*/s/ Kelly E. Farnan*
Kelly E. Farnan (#4395)